Commonwealth of Pennsylvania, Department of Transportation, Appellant, *v.* Acchioni and Canuso, Inc., and Neshaminy Constructors, Inc., Appellees.

Argued February 6, 1974, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-
SON, JR., MENCER, ROGERS and BLATT.

*Stuart J. Moskovitz,* Assistant Attorney General,
with him *Edward A. Hosey,* Assistant Attorney Gen-

eral, *Robert W. Cunliffe,* Deputy Attorney General, and *Israel Packel,* Attorney General, for appellant.

*Steven A. Arbittier,* with him *Wolf, Block, Schorr & Solis-Cohen,* for appellees.

OPINION BY JUDGE BLATT, August 9, 1974:

This is an appeal from an adjudication of the Board of Arbitration of Claims (Board) in a matter involving Acchioni and Canuso, Inc. and Neshaminy Constructors, Inc. (appellees) and the Commonwealth of Pennsylvania, Department of Transportation (PennDot). The appellees were named the contractors for a project which involved the construction of a 33 span multi-girder bridge, a box beam bridge and an arch culvert on South Broad Street in Philadelphia. All three portions of the project involved the installation of concrete piles (cast-in-place concrete piles consisting of steel shells filled with concrete) and the appellees subcontracted with Raymond International, Inc. (Raymond) to complete the pile installation.[1]

The appellees claimed before the Board that, as a result of unusual and unanticipated subsurface conditions encountered on the project and PennDot's arbitrary refusal to change its requirements, Raymond was forced to use "extraordinary methods" in order to meet the minimum tip elevations for installation of certain of the piles, as a result of which appellees will have to reimburse Raymond to cover the additional costs involved.[2] The Board concluded that, (a) the appellee could justifiably rely on the soil profile furnished by PennDot before bidding, even though it was thought by the Board to be erroneous as to several

---

[1] PennDot approved the selection of the subcontractor and, of course, held it to the same requirements as those imposed on the contractor.

[2] The parties stipulated that damages, in the event that they are owing, shall be $100,000.

areas; (b) PennDot acted unreasonably in refusing requests by Raymond to raise the minimum tip elevation; (c) the contract for the multi-girder and box beam bridge incorrectly represented that 7 guage steel could be driven by normal methods to the minimum tip elevation; and (d) the gauge provision allowed only for 7 gauge piles and nothing else. Therefore, because Raymond was entitled to recovery for its costs from the appellees, the appellees were awarded $100,000.

Our scope of review is limited and we must affirm the order of the Board unless it was not in accordance with law or there was an absence of substantial evidence to support the findings of fact. *Penn-Jersey Contractors, Inc. v. Commonwealth of Pennsylvania, The General State Authority,* 12 Pa. Commonwealth Ct. 203, 315 A. 2d 920 (1974). We find here that certain basic principles of contract law were overlooked by the Board, and we must reverse.

Parties have the right to make their own contract, and it is not the function of the court to rewrite it or give it a construction in conflict with the plain meaning of the language used. *Michael Baker, Jr. v. Commonwealth of Pennsylvania, Department of Transportation,* 12 Pa. Commonwealth Ct. 254, 315 A. 2d 669 (1974). Courts must interpret contracts as written, and in construing a contract each and every part of it must be taken into consideration and be given effect; the intention of the parties must be ascertained from the entire instrument. *John McShain, Inc. v. General State Authority,* 9 Pa. Commonwealth Ct. 427, 307 A. 2d 469 (1973).

In reviewing the agreement we must note that the contract specifically incorporated "the original proposal . . ., Form 408, Specifications, dated 1967, and Form 409 dated 1967," as well as "the drawings of the project, prepared and/or approved by the Department of Highways."

The contract language itself specifically refutes the Board's conclusion that the appellees could rely on the soil profile taken by PennDot. "The contractor further covenants and warrants that he has had sufficient time to examine the site of the work; that he has examined the site of the work; that he has had sufficient time to examine the site of the work to determine the character of the subsurface material and conditions to be encountered; that he is fully aware and knows of the character of the subsurface material and conditions to be encountered; and that he has based the within contract prices on his own independent examination and investigation of the site, subsurface materials, and conditions and *has not relied on any subsurface information furnished to him by the Commonwealth of Pennsylvania, Department of Highways.*" (Emphasis added.) Nonetheless, appellees relied on *Pennsylvania Turnpike Commission v. Smith,* 350 Pa. 355, 39 A. 2d 139 (1944), which allowed the contractor to recover for additional expenditures. This case, however, is easily distinguishable, because in *Smith* the contractor was compelled to rely on plans which the Turnpike Commission knowingly and substantially misrepresented thereby creating a constructive fraud upon the contractor.[3] *See Branna Construction Corporation v. West Allegheny Joint School Authority,* 430 Pa. 214, 242 A. 2d 244 (1968); *Montgomery v. Philadelphia,* 391 Pa. 607, 139 A. 2d 347 (1958).

The above quoted contract provision is further strengthened by language in Section 102.05 of Form 408, Specification, which clearly cautions the bidder not to rely on the documents of PennDot nor to assume

---

[3] We note that the core borings taken for PennDot in order to design this project were made by Raymond International, Inc., who was later chosen to be the subcontractor.

that other conditions may exist which would affect the cost and/or quantity of work. Moreover, the law is clear that "a contractor is presumed . . . to have assumed the risk of unforeseen contingencies arising during the course of the work, unless performance is rendered impossible by an act of God, the law, or the other party." *O'Neill Construction Company, Inc. v. Philadelphia*, 335 Pa. 359, 361, 6 A. 2d 525, 526-527 (1939).

Bidding on contracts is unquestionably a risky operation especially where, as here, it is made clear that reliance cannot be assumed on the tests which the Commonwealth had taken in order to determine its design criteria. At the hearing, the Board members intimated that perhaps this type of contract bidding should be changed because of the great amount of risk involved. Nonetheless, although we may sympathize with the problem of bidders, we are bound to enforce the contract to which the parties agreed. The appellees knew or should have known that there is always a risk involved in the event of unanticipated problems arising on a project and should have considered such a contingency in making their bid and adjusted the bid accordingly.

We must further disagree with the Board's conclusion that the contract documents "incorrectly represented that seven gauge steel could be driven to the minimum tip elevation by normal driving methods." The major controversy here centers on the following contract requirements with respect to the problem areas in the multi-girder bridge and the box beam bridge:

1. Piles are to be cast-in-place concrete piles with minimum 7 gauge shell.

2. Piles shall be driven to at least the minimum tip elevation shown on the plans, but in no case to a bearing value less than fifty-five (55) tons per pile.

As to the first requirement appellees contend, and their witness testified, that minimum 7 gauge means

that, "I am obliged to provide a pile with a wall thickness of 7 gauge and nothing one iota less, but it follows from that that I am not compelled to provide anything of any greater thickness." We disagree. The plain meaning of *"minimum"* 7 gauge infers that a thicker gauge may be required and such was properly contemplated under the contract.

As to the second requirement, admittedly the subcontractors had difficulties, sought advice as to their problems, and had meetings with PennDot concerning the minimum tip elevation. In fact, relaxation of the requirement was granted on several of the piles. However, the methods which were used to attain compliance with the contract requirements did not fall outside the contract definitions of normal driving methods. The methods used by Raymond included predrilling and welding special steel plate closures on the insides of the tips of the shells so that they could be driven internally with a mandrel. Section 1005.3(b) of Form 408, Specifications, explains the term "driven" and includes those methods used by Raymond.

"Timber, concrete and steel piles shall be driven with gravity, steam, air and diesel hammers or *in combination with water jets or predrilling.*

"Hammer blows shall be distributed over the entire area of the pile butt. Timber pile butts shall be protected with metal bands, collars or other devices to prevent splitting, excessive brooming, or other damage to the pile.

"Flat driving heads shall not be used for steel piles. *Recessed driving heads or mandrels shall be used for driving cast-in-place concrete pile shells."* (Emphasis added.)

Finally, we cannot label the insistence of PennDot that its contractors comply with the contract requirements as arbitrary. Merely because relaxation of requirements was granted in one problematic area does

not mandate that the chief engineer need relax the requirements in other areas where, after meetings and thoughtful consideration, he deems that such requirements are necessary for public safety.

For the above stated reasons, therefore, we enter the following

ORDER

Now, August 9, 1974, the order of the Board of Arbitration of Claims, dated September 7, 1973, is hereby reversed, and the claim of the appellees denied.