Commonwealth of Pennsylvania, Department of Transportation, Appellant, *v.* Mitchell's Structural Steel Painting Co., Appellee.

Argued January 9, 1975, before Judges CRUMLISH, JR., ROGERS and BLATT, sitting as a panel of three.

*Arthur H. Marateck,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Israel Packel,* Attorney General, for appellant.

*David B. Disney,* with him *McNees, Wallace & Nurick, George C. Xakellis,* and *Xakellis, Perezous & Mongiovi,* for appellee.

OPINION BY JUDGE BLATT, April 30, 1975:

The Pennsylvania Department of Transportation (PennDOT) appeals from an award entered against it by the Board of Arbitration of Claims (Board) in favor of Mitchell's Structural Steel Painting Company (Company) in the amount of $45,000 plus interest.

On April 25, 1972 the Company entered into a contract with PennDOT to paint five bridges located in Clarion County, and, one month later, on May 25 Mitchell commenced the necessary cleaning operations on Bridge No. 2 which crosses the Clarion River in Paint and Monroe Townships. While applying a commercial sandblast to the expansion joints for removal of rust and scale, one of the Company's employees discovered that the existing finish coat of aluminum paint was peeling

off in sheets from the bridge surface. The employee immediately notified Mr. Mitchell, the owner of the Company, of this unusual condition and Mr. Mitchell ordered his employees to stop working on that bridge. On the following day, May 26, and on May 31, Mitchell met with local representatives of PennDOT with whom he discussed the increased anticipated costs which would result from the lack of adherence of the undercoat paint layers. At the conclusion of these meetings, it was agreed that the Company would go back to work on Bridge No. 2 and that the PennDOT representatives would submit a work order to PennDOT's central office in Harrisburg for removal of 60% of the existing aluminum paint at an additional cost of $45,000. The local PennDOT representatives indicated to Mitchell that they themselves did not have the power to approve such an order and that only the Harrisburg office had that power. Mitchell, however, anticipated that the order would be approved and resumed work on June 2. By a memorandum dated June 21, the Harrisburg central office informed the local office that the work order was denied, but this information was never communicated to Mitchell until October 11, which was after the job was completed.

On April 6, 1973 the Company filed its complaint against PennDOT with the Board seeking recovery for its unanticipated costs. After responsive pleadings were filed, an evidentiary hearing was held on September 18, 1973 before Board members Delduco and Kempter. When, however, the Board rendered its decision on April 17, 1974 neither Delduco nor Kempter was any longer a Board member. The award in favor of the Company was signed only by Fred C. Pace, then the Board Chairman, who had not heard the case. PennDOT has now appealed from that award to this Court.

The scope of our review in an appeal from an order of the Board is governed by Section 8(c) of the Act of May 20, 1937, P.L. 728, *as amended*, 72 P.S. §4651-8(c)

which provides in part: "After hearing, the court shall affirm the order unless it shall find that the same is not in accordance with law. The findings of the board as to the facts, if supported by substantial evidence, shall be conclusive."

The first issue which we must consider here is whether or not the change in Board membership between the date of the hearing and the date of the decision necessitates a remand. We believe that it does not. In *Foley Brothers, Inc. v. Commonwealth*, 400 Pa. 584, 163 A.2d 80 (1960) our Supreme Court was faced with a similar situation in which one of the Board members died before the decision was rendered. The court, in rejecting a rehearing, there stated:

"It is obviously advisable, when the legislative command is to hear and determine, that those who decide should hear substantially all of the testimony, except where the delegation of the hearing power to a master or auditor is proper. But the important thing is that they who decide must consider all of the evidence, and in the event of a member of the hearing body dying, it should suffice that his successor consider, by reading from the record what he has not heard, in order to avoid the practical and expensive difficulty of requiring a full-re-hearing. Of equal import is the right of the parties to make argument before the determining body on the issues involved." 400 Pa. at 591, 163 A.2d at 84-85.

Recently in *Commonwealth v. Loffredo* (1115 C. D. 1973), in an unreported opinion which was filed on April 3, 1974, we followed Foley insofar as we denied the appellant a rehearing where two of the Board members, who had participated in the original hearing, were replaced before the Board issued its order. We recognize, of course, that the Board members who issue the final decision must either take part in the preparation of findings of fact and conclusions of law or at least must exercise an inde-

pendent review of them in light of the entire record. In this case, however, there is no evidence, as there was in *Loffredo,* to suggest that such a review was not exercised. The final decision here was signed by the current Board Chairman and the law must presume the regularity of actions taken by public officials until the contrary has been shown. *Wheatcroft v. Schmid,* 8 Pa. Commonwealth Ct. 1, 301 A.2d 377 (1973).[1] Moreover, there seems to be no real dispute here on the facts as found by the Board, and the substantive issues involve questions of contract law upon which both sides submitted briefs to the Board. Those issues have now, of course, been argued orally and in briefs before this Court.

As to the terms of the contract itself, we must determine which party bore the risk that unusual subsurface conditions would make the job more difficult and costly than expected. We believe that the Company bore that risk under the terms of paragraph 4 of the contract, which reads:

"4. The contractor further covenants and warrants that he has had sufficient time to examine the site of the work; that he has examined the site of the work; that he has sufficient time to examine the site of the work to determine the character of the subsurface material and conditions to be encountered; that he is fully aware and knows of the character of the subsurface material and conditions to be encountered; and that he has based the within contract prices on his own independent examination and investigation of the site, subsurface materials, and conditions and has not relied on any subsurface information fur-

---

1. In *Foley, supra,* the Supreme Court stated that "the signatures of all three arbitrators is a guarantee, absent evidence to the contrary, that they gave full consideration to the case." The language regarding signatures in *Ballough v. Civil Service Commission,* Pa. Commonwealth Ct. , 329 A.2d 528 (1974), must, therefore, be considered as dicta.

nished to him by the Commonwealth of Pennsylvania, Department of Transportation."

This language is almost identical to that considered in *Commonwealth v. Acchioni & Canuso, Inc.,* 14 Pa. Commonwealth Ct. 596, 324 A.2d 828 (1974). We there recognized the difficult position of a bidder who must consider various unanticipated risks. But we concluded: "The appellees knew or should have known that there is always a risk involved in the event of unanticipated problems arising on a project and should have considered such a contingency in making their bid and adjusted the bid accordingly." *Acchioni & Canuso, supra,* at 601, 324 A.2d at 831. The Company here explicitly assumed the responsibility for examining the bridge and determining the subsurface conditions. This duty cannot be excused simply because the Company's visual inspection proved to be inadequate.[2] Moreover, nothing in  the record suggests that PennDOT's representatives were aware of the unusual subsurface conditions prior to the signing of the contract. This case is, therefore, distinguisable from *Pennsylvania Turnpike  Commission v. Smith,* 350 Pa. 355, 39 A.2d 139 (1944) where the Turnpike Commission knowingly and substantially misrepresented the character of the subsurface conditions.

The Company argues that it was somehow misled by the specifications which were provided and cites the principle that where a governmental body prepares plans and specifications for a contract, it implicitly warrants that satisfactory performance will result if the plans and specifications are followed. The contract here incorporates Pennsylvania Department of Highways Specifications Form 409 which, in Section 1073.01, provides for

---

2. In previous cases, such as *Acchioni & Canuso, supra,* the term "subsurface conditions" has generally been interpreted as referring primarily to subsoil conditions. But in the context of this contract "subsurface conditions" must include conditions beneath the paint surface.

two alternate methods for cleaning bridges: (A) Commercial Blast Cleaning and (B) Power Tool Cleaning. Other language in the contract, however, seems to indicate a preference for the Power Tool Method, and that method was ineffective in removing the nonadherent aluminum paint. Consequently, the Company used a blasting method instead. Mitchell's own testimony, however, indicates that he was not misled by the specifications, for he anticipated that he would probably have to use a blasting method on this job. He stated that blasting does a better job and is cheaper and that he had not used power tools since 1968. Blasting was also the method used by the Company on the other four bridges covered by this same contract. The real difficulty with respect to Bridge No. 2 was not that use of a blasting method was necessitated but that a commercial blast, as opposed to the cheaper and less time consuming brush blast, was required over the entire surface of the bridge due to the subsurface conditions. This was the type of risk which the Company assumed, however, when it warranted that it had examined the site and become aware of site conditions. The Company's obligation, therefore, was to remove all loose paint before repainting and to use whichever of the suggested methods proved necessary to do that work. *Cf. Appel Media, Inc. v. Clarion State College,* 15 Pa. Commonwealth Ct. 635, 327 A.2d 420 (1974).

The Company also argues that PennDOT's failure to inform it of the work order rejection places liability upon PennDOT for the cost of the extra work. We have already resolved that the Company was under a contractural obligation to clean and paint the bridge at the specified contract price despite the problems involving the nonadherent undercoat. It is also well established in contract law that a promise to pay additional compensation for the performance by the promisee of a contract, which the promisee is already under obligation to the promisor to perform, is without consideration. *Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20 (1968). It is true, of course,

that the courts have recognized an exception to this rule when the legal duty is doubtful or the subject of honest and reasonable dispute, and a promise to perform such a duty may serve as consideration for a new contractual obligation. *Warren Tank Car Company v. Dodson*, 330 Pa. 281, 199 A.139 (1938). In this case, however, Penn-DOT never accepted the Company's proposal that it be paid an extra $45,000 for removal of the aluminum paint. Moreover, there is no evidence that the Company was ever led to believe that its proposal had been approved, and Mitchell himself testified that he was aware that only the central office could effectively grant such approval. As to the fact that the local PennDOT representatives withheld notice of the central office's rejection of the proposal for the allowance of extra work, it is argued that this constituted a fraud by reason of which the Company is entitled to damages. We certainly agree that their silence under the circumstances was misleading to the Company, and surely Mitchell expected to be notified as to any developments in Harrisburg concerning his proposal. We cannot agree, however, that the silence of the local representatives justifies the Board's award to the Company. Even if the Company had been notified promptly that its work order had been rejected, its contractual obligations would still have continued to exist. Or, if it had ceased work on the job because of the dispute, PennDOT could have enforced its rights under the contract and, of course, could have recovered damages for the breach. The Company's position today, therefore, after completing the contract without notice, is no worse than it would have been if notice had been received.

We, therefore, enter the following

## ORDER

Now, April 30, 1975, the order of the Board of Arbitration of Claims dated April 17, 1974, is hereby reversed, and the claim of the appellee is denied.