Central Penn Industries, Inc. *v.* Commonwealth of Pennsylvania, Department of Transportation, (2 Cases)

Argued March 2, 1976, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Mencer, Rogers and Blatt. Judge Kramer did not participate.

*Stuart J. Moskovitz,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for Commonwealth.

*Edward C. First, Jr.,* with him *David B. Disney,* and *McNees, Wallace & Nurick,* for Central Penn Industries.

OPINION BY JUDGE ROGERS, June 2, 1976:

Central Penn Industries, Inc. (hereinafter referred to as Central) under its former name, Central Pennsylvania Quarry, Stripping and Construction Co., entered into a contract with the Commonwealth of Pennsylvania, acting by its Department of Transportation[1] (PennDOT), for the construction by Central of seven miles of a separated highway known as I-84. The project was advertised for bidding on March 11, 1966 and for letting on April 15, 1966. Central's bid of $4,013,528.58 was the low bid. The contract was duly awarded to Central which commenced the work on May 9, 1966 and completed it in December of 1968.

The contract was let and bids received on the unit price basis for many items of the work. After the work was completed the Department issued its Notification of Amount of Final Payment showing the total amount due Central to be $3,886,710.93, an amount arrived at by computation of the amount of work actually done with respect to unit price items. Central objected to the Department's computations of the amount of money due with respect to two unit price items—(1) Class 1 excavation and (2) borrow excavation.

The parties were unable to resolve their differences over the disputed items and Central filed a complaint with the Board of Arbitration of Claims. The Board denied Central any recovery for its claim based upon Class 1 excavation, but awarded Central the amount of $231,240 on its claim with respect to borrow excavation. The Commonwealth has appealed from the action of the Board allowing Central's claim for the borrow excavation, and Central has appealed from the Board's action denying its claim with respect to Class 1 excavation. We have concluded that the Board correctly denied Central's claim for additional compen-

---

[1] Then named the Department of Highways.

sation for Class 1 excavation and that it erred in awarding Central additional compensation for borrow excavation.

## CENTRAL'S APPEAL

PennDOT provided bidders with a Soils Profile, which included a Seismic Survey, purporting to show the hardness and elevation of rock. In doing the work Central encountered the top of rock at elevations higher than those indicated on the Soils Profile. This condition required Central to excavate about 500,000 cubic yards of rock in excess of the amount of rock the Soils Profile provided by PennDOT indicated would be present. This unanticipated work, Central says, caused its cost per cubic yard of Class 1 excavation to be 99.2 cents, 9.2 cents more than its bid price of 90 cents. Central's claim was for $249,026.24, the product of multiplying the total of 2,706,807 cubic yards of payable Class 1 excavation times 9.2 cents.

The contract contains the following familiar exculpatory language:

"The contractor further covenants and warrants that he has had sufficient time to examine the site of the work; that he has examined the site of the work; that he has had sufficient time to examine the site of the work to determine the character of the subsurface material and conditions to be encountered; that he is fully aware and knows of the character of the subsurface material and conditions to be encountered; and that he has based the within contract prices on his own independent examination and investigation of the site, subsurface materials, and conditions and has not relied on any subsurface information furnished to him by the Commonwealth of Pennsylvania, Department of Highways."

Central adduced evidence tending to show that the site location in Pike County was woody and not easily accessible and that it was, therefore, impossible to

make an independent examination of subsoil conditions during the less than one month period between the time it received the bidding documents and the date required for the submission of bids. In fact, Central made no subsoil investigation.

Central bases its case on *Pennsylvania Turnpike Commission v. Smith,* 350 Pa. 355, 39 A.2d 139 (1944), where it was held that the provision by the Turnpike Commission of inadequate time for investigation and of subsoil information combined with the failure of the Commission to provide subsoil information in its possession showing rock conditions to be different and less favorable for easy excavation, was constructive fraud justifying a recovery of additional costs of excavation. The facts of the instant case are crucially different. There is no evidence here that PennDOT was in possession of any information that the rock elevations were different from those shown on the Soils Profile and Seismic Survey. Furthermore, the contract language relied on by the Commission in *Pennsylvania Turnpike Commission v. Smith, supra,* was more to the effect that the subsoil information provided was given in good faith and was not to be construed as an agreement that the character of material had been correctly indicated, whereas by the quoted language of the contract in this case, Central expressly covenanted that it had not relied on subsoil information provided by PennDOT in making its bid.

The case is ruled by the substantially similar cases of *Branna Construction Corporation v. West Allegheny Joint School Authority,* 430 Pa. 214, 242 A.2d 244 (1968), and *Department of Transportation v. Acchioni & Canuso, Inc.,* 14 Pa. Commonwealth Ct. 596, 324 A.2d 828 (1974), petition for allocatur denied December 19, 1974. In both of the cases cited, it was clearly stated that essential to the holding of *Pennsyl-*

*vania Turnpike Commission v. Smith, supra,* was the fact of actual misrepresentation of adverse conditions known to the entity inviting bids. It follows that insufficiency of the time allowed for investigation by bidders, standing alone, will not support a claim for extra compensation for unanticipated subsoil conditions. As indicated by Judge BLATT in her opinion in *Department of Transportation v. Acchioni & Canuso, Inc., supra,* the risk of unanticipated subsoil conditions is always present in projects let on an unclassified basis and one which should be considered by contractors when formulating their bids.

## PENNDOT'S APPEAL

The facts with respect to Central's claim for additional cost of borrow excavation are somewhat unusual and bear a somewhat detailed description. Central's bid for an estimated 330,594 cubic yards of borrow excavation was 68 cents per cubic yard. It claims that it should be paid at the rate of $3.52 per cubic yard for 82,000 cubic yards of granular material required by the specifications to constitute the top one foot of embankments. This granular material was to consist of natural or synthetic mineral aggregates of which at least 65 per cent would be retained in a No. 200 sieve and to be obtained from Class 1, Class 2 or borrow excavation on the project. Central started work in May of 1966. On August 23, 1966, a soil engineer of the Commonwealth reported that materials taken from one location on the site did not pass a test for suitability for use as granular topping material. This information was given to Central which, by letter dated September 26, 1966, asked PennDOT to permit it to form the top foot of embankments of soil as well as granular material. This request was refused. In September and October 1966, PennDOT performed tests of materials taken from the job site at other

locations which did pass muster as granular material and which was in sufficient quantities to provide the 82,000 cubic yards needed. The Commonwealth neglected and failed to inform Central of these later tests and Central did not become aware that they had been made or of their results until long after it completed the work. Apparently, partially as the result of the first and unsuccessful test, Central went to borrow pits off the site from which it provided the required 82,000 cubic yards of granular topping at a cost, it asserts, of $3.52 per cubic yard. The Board awarded the amount claimed based on the conclusion that the failure of PennDOT to notify the contractor of the successful tests made in September and October of 1966 was a constructive fraud, similar to the failure of the Turnpike Commission to notify bidders of rock conditions known to it and different from those shown in the bidding documents in *Pennsylvania Turnpike Commission v. Smith, supra.* This would be an appealing thesis were it not for the fact that Central wholly failed to give PennDOT the notice required as a condition precedent to such claim by Section 1.9.9 of the Specifications, which reads as follows:

"PRESENTATION OF CONTRACTOR'S CLAIMS—

Neither the contractor nor the surety shall be entitled to present any claim or claims to the Secretary or to the Board of Arbitration of Claims named in the contract, either during the prosecution of the work or upon completion of the contract, for additional compensation for any work performed which was not covered by the approved drawings, specifications and/or contract, or for any other cause, *unless he or it shall have given the Secretary due notice in writing* of his or its intention to present such claim or claims as hereinafter designated; provided, however, that the contractor or his surety shall not be

denied the rights to present any claim which is based on differences in measurements or errors of computations which are not disclosed until preparation of the final certificate.

"The *'due notice in writing'* as required above, must have been given to the Secretary of Highways or the engineer within ten (10) days of the time the contractor performed such work or any portion thereof, should have performed such work or any portion thereof, or was impeded or prevented from doing such work or any portion thereof by the Department of Highways, its authorized representative or anyone else; that is to say the contractor must give due notice in writing within ten (10) days from the inception of the claim as a condition precedent to presenting the claim." (Emphasis in original.)

The writing quoted was not simply a provision tucked away among the many sections of Form 408, Specifications, incorporated by reference to the contract; it was, rather, attached to the signed portion of the contract and would not have been overlooked by any bidder using reasonable care in making the contract or pursuing the work. While, as Central contends, it might have used onsite borrow material at reduced expense if it had known of the successful September and October 1966 tests, so also might Penn-DOT have provided Central with the information obtained in those tests if it had been alerted by Central's providing it with the notice required by Section 1.9.9. The equities, therefore, are in equipoise— PennDOT could have spared Central extra expense by care in communicating, and Central might have spared itself the same expense by following the dictates of the contract. In any event, Section 1.9.9 is there,[2] and it is not our function to rewrite the con-

---

[2] Central's contention that a letter from it to PennDOT's district engineer dated September 26, 1966 provided sufficient notice

tract. *Michael Baker, Jr. [Inc.] v. Commonwealth, Department of Transportation,* 12 Pa. Commonwealth Ct. 254, 315 A.2d 669 (1974).

We finally note that as of the time of the Board's hearings in August 1974, PennDOT admittedly owed Central $26,034.64 retainage, the award of which is not here questioned.

## ORDER

AND Now, this 2nd day of June, 1976, the decision and order of the Board of Arbitration of Claims denying judgment for Central on account of asserted extra Class 1 excavation (Count I of the Complaint) is affirmed; and the Board's action in awarding Central the sum of $231,240 plus interest with respect to borrow excavation (Count II of the Complaint) is reversed.

---

of claim under Section 1.9.9 is without merit. The letter merely requests a change in the specifications and contains not a hint of a claim.

---

### DISSENTING OPINION BY JUDGE WILKINSON:

I must dissent from the Court's reversal of the Board's action in 1450 C.D. 1975, wherein the Board awarded appellee the sum of $231,240.00 plus interest with respect to the borrow excavation.

I do not consider the equities to be in equipoise. Appellee's claim for additional compensation is based on the appellant's withholding the information it had that material on the job site did pass muster, whereas it had previously notified appellee that it did not. As the Board of Arbitration properly found, appellee cannot be expected to give ten days' notice prior to beginning extra work when the claim is based on information which was withheld by appellant under circumstances found to constitute a constructive fraud. The knowledge of this wrongfully withheld informa-

tion came to appellee, as pointed out by the majority, long after the completion of the work for which claim is made and was allowed by the Board.

Judge BLATT joins in this dissent.