210

J. E. Brenneman Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Argued October 6, 1980, before President Judge CRUMLISH and Judges BLATT and CRAIG, sitting as a panel of three.

*Vincent B. Mancini,* with him *Richard E. Burnham,* and *Joanne M. Lindsey, Kassab, Cherry, Curran and Archbold,* for petitioner.

*Mark F. Brancato,* Assistant Attorney General, with him *Stuart J. Moskovitz* and *Paul A. Logan,* Assistant Attorneys General, *Robert W. Cunliffe,* Deputy Attorney General, and *Edward G. Biester, Jr.,* Attorney General, for respondent.

OPINION BY JUDGE BLATT, January 21, 1981:

The petitioner in this case, J. E. Brenneman Company, appeals a decision of the Board of Claims (Board) rejecting the petitioner's contractual claims against the Commonwealth's Department of Transportation (DOT).

In 1970, the petitioner, after being chosen as the successful bidder in the construction project in question, entered into a written agreement with DOT in which the petitioner agreed to provide all the materials and labor for the improvement of the road and bridges along a certain section of highway in Montgomery County. As part of the construction of twin bridges involved in the project, the petitioner originally was to furnish 271 lengths of 36-inch diameter drilled caissons,[1] aggregating approximately 5271 linear feet, but the project was subsequently redesigned, requiring the addition of extra caissons for a total of 276. When DOT sent out its initial requests

---

[1] The Board defined a "caisson" as "[a] watertight box or cylinder used in excavating for foundation or tunnel pits to hold out water so that concreting or other construction may be carried out."

for bids, it included plans and specifications declaring that the caissons were to be seated on rock with a bearing capacity of 15 tons per square foot and delineating, as the Board found, "the distance into which the foot of the caissons was to be socketed into solid rock or minimum tip elevations."[2] The documents also contained the results of 73 test holes which had been bored by an independent company at DOT's direction in order to indicate subsurface conditions and facilitate the design of the pier structures which were to support the roadbeds of the bridges. The petitioner began installation of the caissons and, at times, encountered rock above the minimum tip elevation which was not shown in the test hole data. In 78 of the caissons in which unanticipated rock was discovered, DOT did not insist that the petitioner reach the minimum tip elevation specified in the drawings, but in all other such instances DOT required that the rock be removed and that the caissons penetrate at least to the minimum tip elevation.

The petitioner filed a complaint before the Board alleging four counts against DOT. Count I maintained that DOT failed to provide adequate test borings for the project, that there was insufficient time between DOT's solicitation of bids and the deadline for their submission to allow the petitioner to seek its own subsurface survey and, as a result, materially different subsurface conditions were discovered which required the petitioner to excavate and extract 1523.6 linear feet of excess rock. Count II alleged that the drawings specify that the caissons were to be socketed one foot into solid rock and that DOT's insistence that the petitioner could not stop after drilling one foot into rock but must continue to penetrate at least

---

[2] "Minimum tip elevation" refers to the minimum depth to which the bottom of a caisson must penetrate.

to the minimum tip elevation caused the petitioner damages by necessitating removal of 1812.4 linear feet of additional rock. Count III claims that DOT acted arbitrarily and capriciously by requiring that the caissons penetrate through more than one lineal foot of rock and to the minimum tip elevation. Count IV contends that, as a result of the delays caused by the unnecessary excavation delineated in the first three counts, the petitioner could not keep up its schedule for erection of the structural steel used to support the bridges and consequently incurred damages for storage and repainting of that steel. After multiple hearings and the taking of extensive evidence, the Board denied all the petitioner's claims.

Our scope of review is limited to determining whether or not the order of the Board of Claims was supported by substantial evidence and was in accordance with law, PennDOT v. E. J. Albrecht Co., 48 Pa. Commonwealth Ct. 491, 409 A.2d 1202 (1980), and, after reviewing the case law and the reproduced record, we must affirm the Board's order.

The petitioner contends that the Board erred in not finding that DOT was guilty of constructive fraud in that the test hole data misrepresented the subsurface conditions which could be expected. Pennsylvania Turnpike Commission v. Smith, 350 Pa. 355, 39 A.2d 139 (1944), or, alternatively, that the insufficiency of that data combined with ambiguities within the contract and DOT's arbitrary administration of the agreement amounted to such fraud.

The petitioner declares that DOT misrepresented the subsurface conditions of the area in that prospective bidders were given insufficient time between DOT's request for bids and the deadline for submission of bids to undertake independent tests of the subsurface and that, therefore, the petitioner

necessarily and justifiably relied upon the test hole data which was distributed by DOT, but which did not adequately depict the actual subsurface conditions.

The very language of the contract itself refutes this argument. The contract documents included Form 408, Specifications, Section 102.05 which provides:

Wherever subsurface material information is indicated on the drawings, based upon soundings, dug test pits, and/or auger or test borings, such information relative to the character of subsurface material is of a preliminary nature and has been obtained for the exclusive use of the Department to facilitate the design of the project. Therefore, this information is *not to be considered as a part of the drawings,* cross-sections, proposal, *or contract, nor as a factor for computation of the unit prices used for bidding purposes.* There is no expressed or implied agreement that the depths or the character of the material have been correctly indicated at, or that uniformity of material exists between, the explored locations, and *the bidder is expressly cautioned not to rely on the privileged information, but to assume the possibility that conditions, affecting the cost and/or quantities of work to be performed, may differ from those indicated.* (Emphasis added.)

And paragraph 4 of the contract states:

*The contractor further covenants and warrants that he has had sufficient time to examine the site of the work; that he has examined the site of the work;* that he has had sufficient time to examine the site of the work to deter-

mine the character of the subsurface material and conditions to be encountered; *that he is fully aware and knows of the character of the subsurface material and conditions to be encountered; and that he has based the within contract prices on his own independent examination* and investigation of the site, subsurface materials, and conditions *and has not relied on any subsurface information furnished to him by the Commonwealth* of Pennsylvania, Department of Transportation. (Emphasis added.)

In *Department of Transportation v. Acchioni & Canuso, Inc.,* 14 Pa. Commonwealth Ct. 596, 601, 324 A.2d 828, 831 (1974), this Court enforced identical exculpatory clauses in a similar case and noted:

Bidding on contracts is unquestionably a risky operation especially where, as here, it is made clear that reliance cannot be assumed on the tests which the Commonwealth had taken in order to determine its design criteria. . . . Nonetheless, although we may sympathize with the problem of bidders, we are bound to enforce the contract to which the parties agreed. The appellees knew or should have known that there is always a risk involved in the event of unanticipated problems arising on a project and should have considered such a contingency in making their bid and adjusted the bid accordingly.

Furthermore, in *Central Penn Industries, Inc. v. PennDOT,* 25 Pa. Commonwealth Ct. 25, 30, 358 A.2d 445, 448 (1976), we specifically found that "insufficiency of the time allowed for investigation by bidders, standing alone, will not support a claim for extra compensation for unanticipated subsoil conditions."

It is further argued that the combination of the inaccuracies of the test hole data with DOT's alleged capricious and arbitrary enforcement of the minimum tip elevation provisions and ambiguous terms of the contract constituted constructive fraud. *Cf. Pennsylvania Turnpike Commission v. Smith, supra.* DOT was neither arbitrary nor capricious, however, when it insisted that the caissons penetrate at least to the minimum tip elevation. The depth to which the caissons were to be excavated was clearly marked on the contract drawings and the specifications for each pier structure stated that "[f]oundation columns shall penetrate to at least the elevation shown on pier elevation above." In *Department of Transportation v. Acchioni & Canuso, Inc., supra,* we held explicitly that DOT did not act arbitrarily when it required that the contractor meet the minimum tip elevations which were specified in the contract.[3] And, as to the ambiguity of the contract, the petitioner claims that the agreement required that the caissons be imbedded into "sound rock," but that the term "sound rock" was defined nowhere in the agreement. It is contended that the petitioner's interpretation of the specifications which would require them to penetrate only one foot into any rock which was encountered[4] should prevail in that an ambiguous contract term should be

---

[3] It is irrelevant that DOT granted relief to the petitioner from the minimum tip elevation for 78 of the caissons. "Merely because relaxation of requirements was granted in one problematic area does not mandate that the chief engineer need relax the requirements in other areas where, after meetings and thoughtful consideration, he deems that such requirements are necessary for public safety." *Department of Transportation v. Acchioni & Canuso, Inc., supra,* at 602-603, 324 A.2d at 832.

[4] Although we would tend to agree with DOT that such an interpretation of the specifications is unreasonable, for the sake of this argument we will accept it as a plausible conclusion from the contract.

interpreted against the drafter, in this case, DOT. *PennDOT v. DePaul*, 29 Pa. Commonwealth Ct. 447, 371 A.2d 261 (1977). But again we must disagree. The petitioner does not claim that DOT required penetration of more than one foot into rock once the minimum tip elevation had been achieved, and because we have already held that DOT was well within its rights to require that the caissons be sunk to the minimum tip elevation, the contention that ''sound rock'' was encountered above that depth does not change the petitioner's contractual obligations.

Finally, the petitioner claims that the exculpatory clauses discussed earler serve to negate the ''changed condition'' clause of the contract which allows a contractor to seek additional compensation in the event that he encounters subsurface conditions that either materially differ from those stated in the contract or are of an unknown or unusual nature.[5] This ''changed conditions'' clause, however, is inapplicable here. In light of the exclusion of the test hole data from the agreement, as provided in Section 102.05, Form 408, Specifications, *supra,* the contract contains no indication of the subterranean materials which were to be expected. Furthermore, we must agree with the

---

[5] Section 104.02 of Form 408, Specifications provides:

Should the contractor encounter, or the Department discover, during the progress of the work, subsurface or latent physical conditions at the site *differing materially from those indicated in the contract, or unknown physical conditions at the site of an unusual nature,* differing materially from those ordinarily encountered as and generally recognized as inherent in work of the character provided for in the contract, the engineer shall be promptly notified in writing of such conditions before they are disturbed. The engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause an increase or decrease in the cost of, or the time required for performance of the contract, an equitable adjustment will be made and the contract modified in writing accordingly. (Emphasis added.)

218

Board that, inasmuch as the petitioner did not dispute his awareness of the presence and nature of the Conestoga limestone which underlay the project, he cannot claim that the characteristics of this type of rock constituted an unusual or unknown condition.

We shall therefore affirm the order of the Board of Claims.

ORDER

·AND Now, this 21st day of January, 1981, the order of the Board of Claims in the above-captioned matter is hereby affirmed.