Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Westmoreland Engineering Company, Respondent.

Argued September 18, 1981, before Judges BLATT, CRAIG and MACPHAIL, sitting as a panel of three.

*Mark F. Brancato,* Assistant Attorney General, with him *Ward T. Williams,* Chief Counsel, and *Harvey Bartle, III,* Attorney General, for petitioner.

*George I. Bloom,* with him *Thomas P. Shearer,* and *Lawrence A. Layton,* for respondent.

OPINION BY JUDGE CRAIG, December 21, 1981:

The Pennsylvania Department of Transportation (PennDOT) appeals a decision of the Board of Claims (board) which awarded Westmoreland Engineering Company, Inc. compensation for engineering services claimed pursuant to a professional services contract.

To introduce the issues, some history from the record is helpful.

PennDOT's District 12 office (district) had prepared a preliminary design study for a proposed LR 1015 (Legislative Route) northward from Mount Pleasant to New Stanton, ending at a trumpet interchange with I-70 just west of New Stanton. PennDOT's central office approved the preliminary design, and, anticipating federal funding, sent the study to the U.S. Bureau of Public Roads (BPR), which recommended, among other changes, the elimination of the existing I-70 intersection with the primary New Stanton business road (LR 64125) located a short distance east of the LR 1015/I-70 interchange.

At a public hearing, New Stanton business people objected to the elimination of the I-70 intersection with the business road because of the business access it provided.

On January 8, 1968 PennDOT executed a contract with Westmoreland to prepare the *final design* of the LR 1015 project, including also a special study of possible improvements in PennDOT's preliminary design, considering BPR's recommendations.

In the Spring of 1968, the Chrysler Corporation decided to build an assembly plant south of New Stanton, near the LR 1015 preliminary design line, astride the existing LR 64125. Therefore, PennDOT also agreed that Westmoreland design a relocated alignment of LR 64125 and revise the LR 1015 preliminary design line south of station 370;[1] several alternative preliminary design lines resulted.[2]

Because of the importance of the Chrysler project, there was a climate of urgency; PennDOT shortcut normal procedures and lines of authority, issued oral orders, and often reduced agreements to writing after the fact. On three separate occasions, PennDOT placed the LR 1015 final design work on hold to facilitate other activities.

This appeal involves only work entirely within section four of LR 1015, north of station 370. After

---

[1] Station 370 is a final design station. When PennDOT instructed Westmoreland to develop this new alignment no final design stations existed and station 370 was referred to as preliminary design station 527+85. After the realignment was completed new final design stations were designated. These final design stations have different numbers than the preliminary design station. For convenience, we will refer only to the final design station numbers.

[2] Preliminary design work on portions of these lines became supplements to the original L.R. 1015 final design contract.

final design work on that section four ended in January, 1972, PennDOT paid Westmoreland only for 50.6% of the work on the section, based on PennDOT's tentative 1967 estimated construction costs, $7,300,000. PennDOT refused to pay any more under the contract.

Westmoreland claims that it actually completed 59.3% of the final design work by January, 1972, and contends that, under the terms of the contract, the percentage of completion should be applied to construction costs estimated as of the time of cancellation, in April, 1976; that estimate was $22,285,827.

The board agreed, concluding that Westmoreland's fee should be calculated using the April, 1976 cost estimate. However, the board also found that PennDOT was entitled to a credit of $6,812.56 for supplying maps, and a credit of $62,434.65[3] for progress payments it had already made to Westmoreland. Thus, the board ordered PennDOT to pay Westmoreland $393,295.43.[4]

_____

[3] This figure reflects 50.6 percent of $137,098.68, the PennDOT approved tentative engineering fee for section four less ten percent retained by PennDOT. This tentative fee is 3.5 percent of $4,244,001, the estimated construction cost assigned to section four when the parties apportioned the original 1967 PennDOT estimated construction cost for the entire project, $7,300,000, between section three and four.

[4]

| | |
|---|---|
| $22,285,827.45 | April, 1976 construction cost |
| x 0.035 | Contract fee rate |
| 780,003.96 | |
| x 0.593 | Percentage of final design completed |
| 462,542.35 | |
| — 6,812.56 | Mapping credit |
| —62,434.36 | Payments made |
| $ 393,295.43 | Fee awarded by board |

On this appeal, PennDOT raises the following issues: Was Westmoreland authorized to proceed with final design between final design stations 370 and 460? Did the design work beyond final design station 460 constitute unauthorized "extra work" outside the scope of the contract? Did Westmoreland fulfill the special study requirements in the contract? PennDOT contends that all of these issues were wrongly decided by the board and that the board's findings are not supported by substantial evidence.

This court must affirm the order of the board unless it is not in accordance with the law or unless findings of fact are not supported by substantial evidence.[5] *Commonwealth, Department of Transportation v. Acchione and Caruso, Inc.,* 14 Pa. Commonwealth Ct. 596, 324 A.2d 828 (1974).

### 1. *Final Design Authorization Past Station 370*

PennDOT asserts that Westmoreland was authorized only to proceed with final design up to station 370, so that PennDOT is not liable for any final design past that point, located approximately one-quarter of the way northward into section four, the final section of proposed LR 1015.

Both parties agree that in May, 1968, PennDOT had orally instructed Westmoreland to halt work on the LR 1015 project,[6] and to conduct a study to determine whether I-70 should be relocated,[7] which could have eliminated section four of LR 1015.

---

[5] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *John McShain, Inc. v. Commonwealth of Pennsylvania, General State Authority,* 9 Pa. Commonwealth Ct. 427, 431, 307 A.2d 469, 472 (1973).

[6] The project was on hold for over a year, which helps to explain the confusion relative to the special study, which the board found was submitted to PennDOT in May of 1968.

[7] The I-70 relocation study was done pursuant to a separate contract between PennDOT and Westmoreland.

But PennDOT admits that Assistant District Engineer Lyons later sent Westmoreland a letter concerning the LR 1015 project, dated August 8, 1969, stating:

> You are hereby directed to proceed with the development for the design of the subject project along the lines which will be discussed at the meeting scheduled in this office on August 14, 1969.

At that meeting, according to Westmoreland's representatives PennDOT ordered Westmoreland to proceed with the entire project; PennDOT's representative testified that Westmoreland was instructed to proceed with design of L.R. 1015 only up to station 370.

The board believed the Westmoreland witnesses. The board found that on August 14, PennDOT instructed Westmoreland to proceed with final design of the entire project. The board also made the following findings: that all of Westmoreland's actions after the August 14 meeting were consistent with Westmoreland's version of the instructions it received; that monetary breakdowns submitted by Westmoreland to PennDOT were based on PennDOT's estimated construction costs for the entire project; that Westmoreland submitted monthly project reports broken down to show completed work in section four; and finally, that PennDOT's own actions, particularly reviewing, certifying and paying Westmoreland's invoices, were consistent with Westmoreland's contention that it was ordered to proceed with the entire project.

The credibility of witnesses and the resolution of conflicting testimony is for the board to determine. The board's findings are supported by substantial evidence, as follows:

(a) The record contains eighty-five progress reports submitted by Westmoreland to PennDOT pur-

suant to the LR 1015 project, the first monthly report after the August 14 meeting stating:

> On Thursday, August 14, 1969 a meeting was held in the District Office and instructions were received from the District to stake the alignment on L.R. 1015 as per the study prepared by the District with the exceptions of the modifications prepared by this office ...

The record also contains later monthly progress reports that show work was completed on section four, with the report dated February 29, 1972 claiming that 60% of the work on section four was complete.

(b)   On August 20, 1969, pursuant to the August 14, 1969 meeting, Westmoreland submitted a monetary breakdown[8] for the *entire* LR 1015 project, which PennDOT approved. Around November, 1971, PennDOT asked for separate monetary breakdowns for sections three and four. There is testimony that, at that time, a PennDOT Deputy District Engineer and Assistant District Engineer visited Westmoreland's offices to review the separate monetary breakdowns for sections three and four, and that they approved those breakdowns.

(c)   Admittedly, PennDOT paid invoices for substantial work on section four, both before and after section four was treated separately; the last two invoices were for section four work only. The February 2, 1972 invoice showed that Westmoreland was billing for 50.6 percent of the work on section four, and PennDOT paid that invoice.

(d)   Without dispute, an authorized PennDOT official certified that the work shown on the progress

---

[8] Monetary breakdowns are a project management tool required by PennDOT and are used as a basis for progress payments. Monetary breakdowns show the PennDOT approved estimated engineering fee amount for the project, distributed among the various tasks or work elements to be performed.

charts and invoices was done and that PennDOT paid the invoices. The board was entitled to believe that such certification implies that the certifying official, or at least someone at the district office, on the certifying official's behalf, has looked at the work for which payment is claimed prior to payment.

PennDOT also contends that BPR and PennDOT *central* office approval was required before any final design work on the LR 1015 project.

PennDOT argues that no additional points of access to or exit from an interstate highway can be included in the plans for any project without federal approval,[9] and contends that BPR did not approve final design for section four beyond final design station 370.

Paragraph five of the contract provides:

Federal participation is anticipated in the cost of the construction of this project and the design and the Supplemental and extra work shall be subject to periodic review by the Bureau of Public Roads.

Westmoreland argues that the contract required it only to submit the special study to the "department" (PennDOT) for approval.

The board found that the contract placed no obligation on Westmoreland to secure any approval from BPR, that Westmoreland had no knowledge of the procedures followed or actions taken by PennDOT relative to federal approvals because all contact with BPR was through PennDOT's central office, and that the contract provides only that Westmorelands records will be subject to review by BPR. On the basis of the record, we affirm those findings.

As did the board, we also reject PennDOT's attempt to disown the authority of its own district of-

---

[9] 23 U.S.C. §111.

fice to authorize final design work to proceed. West-moreland from the outset had a contract for *final design* approved by the central office, and was entitled to rely upon the district office as representing, and being answerable to, PennDOT's central office.[10]

## 2. *"Extra Work" Past Station 460*

Contract specifications paragraph 3.16 says that PennDOT is not liable for extra work outside the contract terms unless ordered, in writing, by the Secretary of Highways or the Chief Engineer. PennDOT contends that no approval was given to do any work beyond station 460, that—even if approval was given—it was oral and therefore inadequate under the terms of the contract, and that, if by the District Engineer, he lacked authority to give any such approval.

Although the president of Westmoreland called the work beyond station 460 "extra work,"[11] the board found that Westmoreland's work between stations 460 and 494+70 was within the scope of the contract and therefore, by implication, that such work was not extra work under specifications paragraph 3.16, requiring a separate written authorization.

There is substantial evidence in the record to support those findings with respect to final design work past station 460.

Pursuant to its review of the LR 1015 site location study prepared by PennDOT's district office, BPR in

---

[10] Because we conclude that the board's finding that Westmoreland was authorized to proceed with work on the entire LR 1015 project under the contract is supported by evidence, we do not reach the issue of whether Westmoreland could recover under a quasi contractual theory.

[11] What Westmoreland's president, Mr. Vitale, meant by his words is not entirely clear from the record. However, the context supports an interpretation that when Mr. Vitale referred to work past station 460 as extra work, he did so only in relation to preliminary design.

1967 had submitted three interrelated recommendations. BPR proposed: (1) that the existing I-70 interchange with the New Stanton business road be eliminated; that there be a full cloverleaf interchange between I-70 and LR 1015, instead of the trumpet interchange design proposed by PennDOT; and that there be "a spur between the north side of the cloverleaf interchange and the local road system of New Stanton ..." The spur route was to provide access from I-70 to New Stanton when the existing I-70/LR 64125 ramps were eliminated.

The record supports a finding that PennDOT adopted all three of BPR's recommendations. In a letter dated August 2, 1967, to District Engineer Mifflin, PennDOT's central office, referring to all three BPR recommendations as "comment number one", said:

> In regards to comment number one of the Bureau's July 13, 1967 letter: this suggestion should be investigated and the scheme presented in the final printing of the report. It appears that the removal of the existing interchange would eliminate congestion and provide for safer operations.

In a letter dated November 1, 1967, the district office, referring to the LR 1015 site location report and BPR's comment number one, informed the central office that:

> Comment Number 1 of the Bureau's letter has been incorporated into the report as Alternate 'B-1', resulting in the recommendation of the combination of Line 'B' + Alternate Line 'B-1' for further development of design ...

The section of proposed LR 1015 between stations 460 and 494+70 is a northern extension of LR 1015 through the cloverleaf, connecting with the access road, LR 64125, to the New Stanton business district.

Station 494+70 is located just west of the Pennsylvania Turnpike. Thus, that portion of LR 1015 past station 460 fits the description of the spur proposed by BPR and adopted by PennDOT.

Moreover PennDOT's own Exhibit No. 18 incorporates the BPR recommendations, clearly showing a cloverleaf intersection and a spur connecting with, and extending east of the business route, a point far beyond station 460. The project thus had to extend beyond station 460 to include the spur in the design.

Because there is substantial evidence to support a finding that the contract was intended to include both preliminary and final design work on LR 1015 past station 460, we therefore affirm the board's decision that Westmoreland is entitled to compensation for work between stations 460 and 494+70.

### 3. Special Study Completion

PennDOT also argues that the special study described in the contract at paragraph two was a condition precedent to any final design. PennDOT asserts that the special study was never done, never submitted to it and never approved, alternatively contending that, if the special study was prepared and submitted, it was reviewed only by PennDOT's district office where no one had authority to approve the study.

We agree with the board that paragraph two of the contract required Westmoreland to prepare and submit the special study to PennDOT for acceptance and approval prior to initiating final design of the project. Also, the terms of the contract support the board's conclusion that there were no specifications, no design requirements and no pay item for the special study, nor does the contract specify that the study must be written or mapped.

On January 24, 1968, PennDOT sent Westmoreland its executed copy of the contract with a cover

letter, over the name of the Chief Engineer. The letter
stated:

The work to be accomplished according to
the terms of this Agreement is under the super-
vision of District Engineer Mr. J. H. Mifflin . . .

Paragraph two says that Westmoreland is to sub-
mit the special study to the "Department". Nowhere
in the contract does it say that the term "Department"
means only PennDOT's central office.

In view of that evidence, the board, construing the
term "Department", correctly held that Westmore-
land could satisfy the provisions of the contract by
submitting the special study to PennDOT's district
office. We conclude that the language of the contract
and the Chief Engineer's January 24 letter gave the
district office authority to approve the special study,
as the board found it did.

The board was confronted with conflicting evidence
on the issue of whether Westmoreland prepared the
special study and submitted it to the district.

Westmoreland's president testified that the study,
reflected by Westmoreland's Exhibit 9, was completed
and submitted to PennDOT's district office, but he
admitted that he did not have personal knowledge of
the delivery of the study. Westmoreland's Mr. Coney-
beer testified that the study was completed and that all
of the appropriate officials at the district office had
seen the plans, knew of Westmoreland's recommenda-
tions and had no objections to them.

Mr. Logan, PennDOT District Location Engineer,
testified that he never saw the special study. Other
PennDOT officials, at both the district and central
offices, testified, with varying degrees of certainty,
that they had not seen the study.

District Engineer Mifflin, however, testified that
he had seen a study prepared by Westmoreland and
that the study involved improving the alignment,

grade and interchange layout geometrics in the New Stanton area. Mr. Mifflin was not sure when he saw the Westmoreland study; he thought he might have seen the study before the New Stanton public hearing, which was before the contract here.

However, the board found that Mr. Mifflin did see a special study prepared by Westmoreland. Mr. Mifflin's testimony, as a whole, reveals confusion as to the timing and sequence of events. The board could have believed that, some ten years after the fact, Mr. Mifflin had seen the special study, but was confused as to when he saw it.

In summary, we find that, regardless of the intended scope of the special study, there is substantial evidence to support the board's finding that the study was done, submitted and approved.

Accordingly we affirm the board's decision in all respects.

ORDER

Now, December 21, 1981, the order of the Board of Claims, Docket No. 526, dated September 3, 1980, is hereby affirmed and judgment is entered in favor of Westmoreland Engineering Company, Inc. and against petitioner, Commonwealth of Pennsylvania, Department of Transportation in the amount of $393,295.43, together with interest at the rate of six (6%) percent *per annum* from April 16, 1976.

Costs not to be reimbursed by either party.