Black Top Paving Company, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Argued September 12, 1983, before Judges ROGERS, WILLIAMS, JR. and CRAIG, sitting as a panel of three.

*Larry A. Housholder,* with him *Lawrence R. Zewe,* for petitioner

*Michael D. Reed,* Assistant Counsel, with him *Ward T. Williams,* Chief Counsel, and *Jay C. Waldman,* General Counsel, for respondent.

OPINION BY JUDGE CRAIG, October 19, 1983:

Black Top Paving Company appeals from an order by the Board of Claims (board) which dismissed the company's claim against the Pennsylvania Department of Transportation (DOT) for $5,382.06, the amount withheld by DOT because of Black Top's inability to meet compaction standards for the wearing (surface) course of an area, designated as Lot 1, under a contract to resurface a legislative route in Perry Township.

We must decide if, in interpreting the contract, the board committed an error of law[1] by (1) holding Black Top to a minimum acceptable theoretical density compaction standard of ninety percent and by (2) concluding that neither constructive fraud nor a mutual mistake of fact existed to excuse Black Top from complying fully with DOT's compaction requirements.

In June of 1977, Black Top and DOT entered into a contract for resurfacing 19,157 linear feet of existing roadway; the contract's sketches and typical sections revealed that the roadway had widths varying from twenty to twenty-four feet between shoulders or between shoulders and existing curb.

Before DOT awarded the contract, Black Top's vice-president, William Spencer, inspected the project site and observed that the highway was not uniformly at least twenty feet wide, and did not have two feet

---

[1] We must affirm the board's order unless it is not in accordance with the law or unless findings of fact are not supported by substantial evidence. *Department of Transportation v. Westmoreland Engineering Co.,* 63 Pa. Commonwealth Ct. 318, 322, 438 A.2d 1005, 1009 (1981).

of bituminous concrete base course widening on each side of the road, as he viewed the typical section drawings. Mr. Spencer did not bring these alleged discrepancies to DOT's attention, however, believing that after the award of the contract but before the start of Black Top's performance, DOT would perform work on the site so that road conditions conformed to the drawings. Hence, Black Top relied solely upon the drawings in preparing its bid.

Before Black Top commenced operations, DOT personnel placed cross drains at various locations along the project and removed unsuitable material from Lot 1, as well as from other portions of the roadway.

Sometime after commencement of the resurfacing project, Black Top constructed three control strips under DOT supervision for the purpose of establishing a standard against which DOT could measure compaction compliance in the field. Specifically, section 401.3(h) of the 1976 Form 408 Specifications (1976 specifications), incorporated by reference into the contract, called for construction of control strips "to obtain the maximum density attainable under the existing field conditions, and employ this target density value as the standard for measurement of compaction compliance for the work."

Section 401.3(h) also provided that (1) upon completion of compaction, DOT would perform density tests at random locations to determine the average in-place density of the control strip, (2) the value of the average would serve as the reference density target for the course, and (3) the value "shall not be less than 92% of the theoretical maximum density[2]

---

[2] Theoretical density is a value associated with optimum compaction of a mass, *i.e.*, 100% compaction.

for the wearing course. . . .'' The contract also provided that if the 92% density target was not met, DOT's engineer could ''direct the use of more effective compaction procedures, or the redesign of the pavement mixture.''

DOT tested the control strips with a nuclear testing gauge; all three strips failed to meet the contract's minimum acceptable theoretical density target of 92%. Black Top, however, achieved 91.8% of theoretical density in one control strip. Therefore, instead of directing the use of more effective compaction procedures or the redesign of the pavement mixture, as provided in section 401.3(h), DOT held Black Top to a 91.8% theoretical density target, which the company had shown it could produce under field conditions.

Upon completion of the project, several locations failed to meet the adjusted 91.8% target. According to the findings of fact, DOT then applied a conversion factor to all failed tests, reducing the acceptable degree of theoretical density to 90%, a reduction of 1.8%. The area designated as Lot 1 failed to meet this reduced standard. Accordingly, DOT adjusted the contract price, using the 90% density standard as the basis for measuring compliance.

### Theoretical Density Standard

Finding that DOT held Black Top to the conversion standard, the board concluded that Black Top failed to prove DOT responsible for the contractor's inability to compact Lot 1 to within 90% of theoretical density.

Black Top contends that it only agreed to have its compaction performance measured against a minimum theoretical density target of 92% and that the board therefore erred by holding Black Top to the

90% standard. Specifically, the company contends that the contract provides for only two remedies when a contractor fails to achieve the 92% target, the use of more effective compaction procedures or redesign of the pavement mixture, and that use of a different density standard by DOT was arbitrary and unreasonable. We disagree.

In their contract, the parties agreed that DOT could accept performance at less than contract specification standards, with a corresponding adjustment in compensation. Specifically, section 106.06(b) of the 1976 specifications provided:

(b) Restricted Performance Specifications

1. Acceptance or Rejection. Following the application of the appropriate acceptance plan, the decision of the engineer shall be final as to the acceptance, rejection, *or acceptance at an adjusted price* of sampled LOTS.

2. Disposition of LOTS. When practical to do so, LOTS not conforming to Specification requirements may be reworked and resubmitted for acceptance sampling. *Non-conforming LOTS of* materials, products, items of construction or *completed construction that are not adaptable to correction by reworking shall be* removed and replaced, accepted with payment, or *accepted at an adjusted price* as stated in the Specifications; or if not stated, *as directed by the engineer.* [Emphasis added.]

Apparently, the engineer decided that Lot 1 was not adaptable to correction by reworking and so, under the terms of section 106.06(b), waived the 92% threshold, lowered the minimum acceptable density target to 90%, and adjusted the price of the contract. Contractual provisions can be waived, expressly or impliedly. *Chung v. Park,* 377 F. Supp. 524, 529 (M.D.

Pa. 1974). Here the contract, by expressly authorizing adjustment, impliedly allowed DOT's engineer to waive the 92% compaction requirement. This does not mean, however, that DOT waived all reasonable compaction standards. DOT's decisions to forego the 92% target and the right of reconstruction did not extinguish its right to hold Black Top to a more lax theoretical density target of 90% and to adjust the contract price accordingly.

### Constructive Fraud and Mutual Mistake

At least before the board, Black Top claimed that DOT had actual knowledge of unsuitable subsurface conditions and that failure to alert Black Top to such conditions amounted to constructive fraud. Specifically, in its complaint, Black Top averred that the typical roadway sections and drawings were inaccurate and misleading in that no base course existed under portions of the project and that the existing base course was not "standard" but "soft and spongy and otherwise unstable and pumped and shifted under legal construction traffic truck roads. . . ."

The board rejected Black Top's claim of constructive fraud, concluding that DOT had no actual knowledge of poor base conditions before awarding the contract to Black Top[3] and had not knowingly provided erroneous subsurface information to the contractor.[4] Moreover, the board concluded that because the contract[5] shifted to Black Top the risk that subsurface materials might differ from those indicated in the

---

[3] Conclusion of Law 9.

[4] Conclusion of Law 10.

[5] Paragraph 4 of the contract provided:

The contractor further covenants and warrants that he has had sufficient time to examine the site of the work; that he has examined the site of the work; that he has had sufficient time to examine the site of the work to deter-

typical drawings,[6] there could be no mutual mistake of fact concerning the nature of subsurface conditions that Black Top might encounter upon commencement of performance.[7]

As to the problems associated with the width of the road, the board concluded that Black Top had knowledge of this condition and thus unreasonably relied upon the typical section drawings.[8]

Black Top no longer appears to argue on appeal that DOT committed constructive fraud. However, the conclusions of law with which it takes exception[9] specifically addressed constructive fraud and mutual mistake. Because we view these theories of recovery as interrelated within the context of this appeal, and because our Supreme Court recently established guidelines for analyzing constructive fraud claims in government contract cases, we will examine both theories of recovery.

In *Department of Transportation v. Acchione and Canuso, Inc.,* 55 Pa. Commonwealth Ct. 65, 423 A.2d 30 (1980), we denied recovery to a contractor claiming constructive fraud under a government contract with DOT by reading *Pennsylvania Turnpike Commission v. Smith,* 350 Pa. 355, 39 A.2d 139 (1944), to

---

mine the character of the subsurface material and conditions to be encountered; that he is fully aware and knows of the character of the subsurface material and conditions to be encountered; and that he has based the within contract prices on his own independent examination and investigation of the site, subsurface materials, and conditions and has not relied on any subsurface information furnished to him by the Commonwealth of Pennsylvania, Department of Transportation.

[6] Conclusion of Law 7.

[7] Conclusion of Law 8.

[8] Conclusions of Law 5, 6.

[9] Conclusions of Law 5, 6, 7, 8.

hold that constructive fraud required a showing of actual misrepresentation of adverse conditions known to the entity inviting bids. Apparently, the board relied upon our *Acchione* decision and its predecessors,[10] when concluding that DOT had no actual knowledge of poor base conditions and has not knowingly provided erroneous subsurface information to Black Top.

Recently, however, the Pennsylvania Supreme Court reversed our decision in *Acchione,* holding that actual knowledge of misrepresentation is not the only touchstone of constructive fraud. *Acchione and Canuso v. Department of Transportation,* Pa. , 461 A.2d 765 (1983), requires that, based upon the *Smith* rationale, we must consider the following critical factors in determining if recovery is appropriate:

(1) Whether a positive representation of specifications or conditions relative to the work is made by the governmental agency letting the contract or its engineer.

(2) Whether this representation goes to a material specification in the contract.

(3) Whether the contractor, either by time or cost constraints, has no reasonable means of making an independent investigation of the conditions or representations.

(4) Whether these representations later prove to be false and/or misleading either due to actual misrepresentation on the part of the agency or its engineer or, by what amounts to

---

[10] *See, e.g. Central Penn Industries, Inc. v. Department of Transportation,* 25 Pa. Commonwealth Ct. 25, 358 A.2d 445 (1976) ; *Department of Transportation v. Buckley & Co.,* 23 Pa. Commonwealth Ct. 18, 350 A.2d 438 (1976) ; *Department of Transportation v. Acchioni and Canuso, Inc.,* 14 Pa. Commonwealth Ct. 596, 324 A.2d 828 (1974).

a misrepresentation through either gross mistake or arbitrary action on the part of the agency or its engineer.

(5) Whether, as a result of this misrepresentation, the contractor suffers financial harm due to his reliance on the misrepresentation in the bidding and performance of the contract.

In its answer to the complaint, DOT admitted that the drawings were inaccurate as to road width. However, assuming that the road widths depicted in the drawings were material to the contract, Black Top cannot claim constructive fraud under *Acchione,* because, as determined by the board, the contractor—by virtue of Mr. Spencer's independent investigation—had actual knowledge of the narrow road widths. Here, the condition of the road was not "uniquely within the purview of Penn Dot." *Acchione* at    , 461 A.2d at 769.

As to subsurface conditions, we note that the specifications depicted an existing bituminous concrete base course, slag base, and bituminous surface course; in its complaint, Black Top alleged that no base course existed under portions of the road and that the existing base course was porous. Based upon substantial evidence of record, however the board found that DOT[11] placed a bituminous concrete base course in Lot 1, presumably remedying any alleged deviation from the typicals before Black Top commenced resurfacing operations.

Moreover, Black Top has not identified any positive representation in the contract or by DOT's engineer as to the quality, density, or firmness of the base

---

[11] In Finding of Fact 22, the board inadventently stated that Black Top placed a bituminous concrete base course in Lot 1; the testimony upon which the board relied, however, reveals that DOT was responsible for this repair work.

course. Without such a "positive representation . . . relative to the work . . .," *Acchione* at   , 461 A.2d at 768, Black Top cannot recover under a theory of constructive fraud.

Black Top also contends that it is entitled to reformation of the contract, excusing full compliance with compaction standards, because the parties mistakenly believed that, as a matter of common industry-wide practice, DOT would perform certain site preparation work allegedly not performed here. The board, however, found that DOT either had no contractual obligation to perform, or had performed, the kind of extensive pre-resurfacing work which Black Top claims DOT routinely performed elsewhere.

Reformation of a contract for mutual mistake of fact can exist only where there are contractual misapprehensions common to both parties. *Flippin Materials Co. v. United States,* 312 F.2d 408 (Ct. Cl. 1963). Here, there were no misapprehensions common to Black Top and DOT; rather, Black Top's mistaken assumptions were unilateral, based not upon facts mutually believed to exist upon entering into the contract but upon Mr. Spencer's perceptions of industry-wide practice.

The board found that the contract did not obligate DOT to widen the road, as Black Top believed, and that even if it did, Mr. Spencer never notified DOT of deviations from the drawings which he encountered on inspection, as required by section 105.04 of the 1976 specifications.[12] Second, DOT placed a bitumi-

---

[12] Section 105.04 provided:

The contractor shall perform the work in accordance with the intent of the drawings and specifications, and shall not take advantage of any error on or omission in the drawings and specifications. In the event the contractor discovers such an error or omission, he shall immediately notify the engineer.

nous concrete base course in Lot 1 before Black Top commenced resurfacing operations. The board also found that the contract made no representations as to the quality, density, or firmness of existing sub-surface conditions; thus, any assumptions as to quality, density, or firmness were Black Top's alone. Finally, the board apparently did not find Mr. Spencer's testimony on DOT's industry-wide practice credible, having made no finding that DOT routinely performs the kind of extensive repair work claimed by Black Top. *See Department of Transportation v. Westmoreland Engineering Co.*, 63 Pa. Commonwealth Ct. 318, 323, 438 A.2d 1005, 1009 (1981) (credibility of witnesses is for board to determine).[13]

---

[13] As the primary basis for disposing of Black Top's mutual mistake argument, the board relied upon the longstanding contract principle that "a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation. . . ." *Flippin* at 415; *McNamara Construction of Manitoba, Ltd. v. United States*, 509 F.2d 1166 (Ct. Cl. 1975). *See generally*, 13 *Williston on Contracts* §1543, 1543A (where party has agreed to be bound regardless of any mistake that may be made and assumes risk of every chance occurrence, there will be neither reformation nor recision) ; 3 *Corbin on Contracts* §598 (where risk of existence of some factor or occurrence of event is consciously considered in agreeing upon terms, there is no mistake).

Here, paragraph four of the contract and section 102.05 of the 1976 specifications squarely place the risk of incorrect subsurface information upon the contractor. See footnote 4.

In dictum, however, our Supreme Court recently suggested that gross mistake, as well as the arbitrary action found in *Acchioni*, Pa. at      , 461 A.2d at 769, can amount to constructive fraud, *id.* at      , 461 A.2d at 768, regardless of contractual provisions which shift the risk of subsurface conditions to the contractor. *See, e.g., Department of Transportation v. Acchioni and Canuso, Inc.*, 14 Pa. Commonwealth Ct. 596, 324 A.2d 828 (1974).

Because this decision rests on the fact that all contractual misapprehensions here were unilateral, no question of "gross mistake" on the part of DOT is involved.

Black Top also contends that the board committed a due process violation by failing to consider in its opinion and order certain extemporaneous statements made by the panel chairman at the hearing. There is nothing in the record, however, to support Black Top's claim that the board failed to consider all of the evidence or the recommendations of the panel.

We affirm.

ORDER

Now, October 19, 1983, the order of the Board of Arbitration of Claims, dated February 17, 1982, is affirmed.