Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Westmoreland Engineering Company, Inc., Respondent.

Argued September 10, 1984, before Judges WILLIAMS, JR., and BARRY and Senior Judge BLATT, sitting as a panel of three.

*John J. Buchy, Jr.,* Assistant Counsel, with him, *Mark F. Brancato,* Assistant Counsel, *Robert H. Raymond, Jr.,* Assistant Chief Counsel, *Spencer A. Manthorpe,* Chief Counsel, and *Jay C. Waldman,* General Counsel, for respondent.

*Thomas P. Shearer,* with him, *George I. Bloom,* for respondent.

OPINION BY JUDGE BLATT, January 31, 1985:

The Pennsylvania Department of Transportation (PennDOT) appeals here a decision and order of the Board of Claims (Board) awarding Westmoreland Engineering Company, Inc. (Westmoreland) compensation for professional services rendered pursuant to Contract No. 39630.[1]

On January 8, 1968, the parties entered into Contract No. 39630 under which Westmoreland agreed to prepare final design plans on L.R. 1015 for a distance of approximately 5.5 miles from Mt. Pleasant to New Stanton, Westmoreland County, in exchange for 3.5% of either the actual construction cost or PennDOT's estimated construction cost if the project was never

---

[1] The Board awarded Westmoreland $347,338.96 plus six percent (6%) interest *per annum* for final design work completed for Section 3A of Legislative Route (L.R.) 1015 and $41,310.33 plus six percent (6%) interest *per annum* for a design location study completed on a proposed free-flow interchange in Section 3A of L.R. 1015.

completed.[2] Additionally, any "extra work" authorized by the Chief Engineer of PennDOT, but not specifically included in the contract, was to be compensated in "an amount equal to the direct certified engineering payroll plus the percentage allowances paid by the Engineer [Westmoreland] for Federal and State Unemployment Taxes, Workmen's Compensation Insurance and the Engineer's share of Social Security contributions, plus 100% thereof unless otherwise specified in the contract." The contract further provided that Westmoreland submit Monthly Progress Reports showing the percentage of work completed, which it did beginning in May 1969 and continuing until the contract was cancelled in April 1976.

The Board's findings reveal that, during the negotiation stage of Contract No. 39630, PennDOT stressed its aim to expedite the completion of final design work so as to accommodate the building and opening of a new Chrysler automobile plant along L.R. 1015. As a result, Westmoreland frequently received oral direction regarding changes in the work to be completed under the contract prior to written notification and in contravention of PennDOT's normal departmental procedure. (Board Finding of Fact No. 20.) Furthermore, once work did begin in February of 1968 by order of J. H. Mifflin, PennDOT's District Engineer assigned to monitor Westmoreland's performance on this project, PennDOT continually altered the design plans as it reevaluated how the construction of the Chrysler plant would impact on the design as initially contemplated.

For example, in May 1968, final design work was halted until completion of a feasibility study involving

---

[2] Contract No. 39630 has been the subject of earlier litigation wherein this Court affirmed a Board decision awarding Westmoreland $393,295.43 together with interest at the rate of six percent (6%) *per annum* from April 16, 1976 for final design work com-

the possible elimination of the existing I-70 intersection with the New Stanton business road (L.R. 64125). Later, in August 1969, work on the final design phase of the project was reinstated, only to be halted again in November 1969 and then recommenced in March 1970. Additionally, as work progressed, PennDOT divided the area covered by the contract into two sections, Section 3 and Section 4, and then, sometime in August 1972, Sections 3 and 4 were further divided to create Section 3A. The parties also executed three written modifications to the contract as the need to add or delete work arose.

Under Contract No. 39630, as originally executed, Westmoreland agreed to develop final design work for, *inter alia*, a diamond-type interchange contiguous to property owned by Chrysler in the area which was later designated Section 3A. Late in 1971, however, PennDOT determined that the diamond-type interchange would be inadequate to handle the traffic flowing in and out of the Chrysler plant and consequently, that interchange design was abandoned. By this time, however, Westmoreland had already begun to develop the final design plans for the diamond-type interchange. Subsequently, in either January or February 1972, Mr. Mifflin orally directed Westmoreland to begin final design work on a free-flow interchange in place of the recently abandoned diamond-type interchange. Simultaneously, PennDOT requested Westmoreland to prepare a design location study for the free-flow interchange.[3]

---

pleted on Section 4 of L.R. 1015. *Pennsylvania Department of Transportation v. Westmoreland Engineering Company*, 63 Pa. Commonwealth Ct. 318, 438 A.2d 1005 (1981).

[3] We note that it appears that both preliminary and final design work were being completed simultaneously and believe that this was due to the urgency with which PennDOT desired the project to be completed.

On June 7, 1973, the parties executed Supplemental Engineering Contract No. 39630-C (Supplement C) which modified Contract No. 39630 and provided that

> *the portion* of L.R. 1015, Section 3 between Station to 262+00 to Station 370+00 including the design of the Chrysler Access Interchange [diamond-type interchange] *is to be deleted* from Agreement No. 39630 and that the Engineer [Westmoreland] shall be paid a compromise lump sum fee of One Hundred One Thousand Three Hundred Twenty-eight Dollars and Eighty-six Cents ($101,328.86) for *this deleted work.* This compromise settlement amount was derived as follows: $5,366,284.00 x 3.5% x 53.-95% [percent completed] = $101,328.86. (Emphasis added.)

Supplement C also provided that all other provisions of Contract No. 39630 remained in full force and effect. Less than a month later, on July 3, 1973, the parties entered into a lump sum agreement, Contract No. 50746, which provided for final design work on L.R. 1015 Spur, an alternate route designed to accommodate the Chrysler plant. In addition, this lump sum contract provided for the development of right-of-way plans for Section 3A of L.R. 1015 to facilitate the condemnation of Chrysler property for necessary right-of-ways.

When PennDOT cancelled Contract No. 39630 in April 1976, Westmoreland submitted invoices seeking payment for the final design plans developed for the free-flow interchange in Section 3A which it claimed had been completed pursuant to Contract No. 39630. PennDOT refused to pay the invoices, contending that Supplement C had deleted Section 3A in its entirety from Contract No. 39630. Alternatively, PennDOT argued that the final design plans developed for the

free-flow interchange were necessary as part of the process of drafting right-of-way plans under Contract No. 50746 and that, therefore, compensation for such work was included in the lump sum figure paid by PennDOT pursuant to that contract.

Westmoreland filed a claim with the Board seeking payment under Contract No. 39630 for the final design work it had completed in Section 3A and for the design location study. The Board ruled in favor of Westmoreland on both counts and the present appeal ensued.

PennDOT raises numerous issues here which can be summarized as follows: (1) whether or not the final design plans prepared for the free-flow interchange were, as the Board found, rendered pursuant to Contract No. 39630 or, as PennDOT contends, under Contract No. 50746 and (2) whether or not the design location study of the free-flow interchange should be compensated, as the Board found, at the rate of .0035 of the estimated construction cost of $11,803,009.42 or, as PennDOT contends, as "extra work" pursuant to Contract No. 39630. And, of course, in reviewing the voluminous record and numerous exhibits before us in this case, we are mindful that we must affirm the order of the Board absent an error of law or a determination that the Board's findings of fact are not supported by substantial evidence. *Department of Transportation v. Acchioni & Canuso, Inc.,* 14 Pa. Commonwealth Ct. 596, 324 A.2d 828 (1974).

In arguing that all of the final design work in Section 3A was done pursuant to Contract No. 50746, PennDOT contends that the Board erred as a matter of law in holding that Supplement C did not delete the area designated Section 3A from Contract No. 39630 and in concluding that Contract No. 50746 provided for the preparation of right-of-way plans but

not for the final design work "incident" to the development of those plans.

PennDOT asserts that the language of Supplement C clearly states that the area between Station 262+00 and Station 370+00, otherwise known as Section 3A, was deleted from Contract No. 39630. An examination of the pertinent provision of Supplement C, *supra* at p. 289, reveals that the language is ambiguous in that it first refers to a specific "portion" of roadway as being deleted and later, in the same sentence, states that Westmoreland is to be compensated for "this deleted work." We believe, therefore, that the Board properly reviewed the conduct of the parties here in attempting to construe Supplement C. *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978) (course of performance is always relevant in interpreting a writing).

We would first note that the Board found that Westmoreland had been instructed to begin final design work on the free-flow interchange in January or February 1972 so that when the parties entered into Supplement C in June 1973, Westmoreland's Monthly Progress Reports revealed that work was sixty percent (60%) complete in Section 3A.[4]

Furthermore, following the execution of Supplement C, Westmoreland continued to submit to Penn-

---

[4] PennDOT contends that the Board did not base its finding that Mifflin ordered final design work on the free-flow interchange to commence in January or February of 1972 on substantial evidence. It asserts that the testimony of a Westmoreland employee regarding Mifflin's instructions to begin final design work is hearsay. Hearsay evidence, of course, is an out-of-court statement offered to prove the truth of the matter asserted. Here, however, Westmoreland sought to prove only the effect the statement had on its work and not the truth of the statement. Consequently, we find the statement was not hearsay, and that the Board's finding is based on substantial evidence. *See Wagner v. Wagner,* 158 Pa. Superior Ct. 93, 43 A.2d 912 (1945).

DOT Monthly Progress Reports, revealing that final design work was progressing in Section 3A, for a period of over two (2) years without any objection from PennDOT until Westmoreland submitted its final invoices. In fact, in the six months following the signing of Supplement C, the Monthly Progress Reports submitted pursuant to Contract No. 39630 show that final design work on Section 3A had progressed from sixty percent (60%) completion in June 1973 to eighty percent (80%) completion in December 1973. Furthermore, in January 1974, PennDOT District Engineer James B. Wilson confirmed an audit report for Westmoreland's accountants which stated that eighty percent (80%) of the final design work on L.R. 1015 Section 3A *under Contract No. 39630* had been completed. Clearly, PennDOT's silence in the face of information it possessed revealing that Westmoreland continued to do final design work on Section 3A pursuant to Contract No. 39630 following the execution of Supplement C is substantial evidence that Supplement C did no more than compensate Westmoreland for final design work on the abandoned diamond-type interchange. We concur, therefore, with the Board's conclusion that Supplement C did not delete the area encompassed by Section 3A from Contract No. 39630.

PennDOT further asserts that any final design work completed by Westmoreland in Section 3A was done in order to prepare the right-of-way plans contracted for under Contract No. 50746 and that, consequently, compensation for the Section 3A final design work was included in that lump sum contract. Specifically, PennDOT argues that the Board erred in holding that "Exhibit A" to Contract No. 50746 is not part of that agreement. PennDOT submits that "Exhibit A", consisting of an engineering proposal submitted by Westmoreland during the course of contract

negotiations, implies that final design work "incident" to the preparation of right-of-way plans in Section 3A would be developed under Contract No. 50746.

In support of the Board's holding, Westmoreland contends that the "Scope of Work" provision within the body of Contract No. 50746 clearly establishes that *only* right-of-way plans were contemplated as part of the work agreed to under Contract No. 50746 and that, therefore, the Board could not look to extrinsic evidence—*i.e.* "Exhibit A"—in construing the document. Westmoreland also maintains that it is unreasonable to presume that it would have agreed to include the final design plans for the free-flow interchange as part of the lump sum contract since that work was begun in January 1972[5] and Contract No. 50746 was not executed until July 1973. Westmoreland also points out that it was necessary to complete 84.08% of the final design plans for the free-flow interchange prior

---

[5] PennDOT asserts that J. H. Mifflin, the District Engineer assigned to supervise Westmoreland's work on L.R. 1015, had no authority to direct Westmoreland to proceed with final design of the free-flow interchange in January or February of 1972. In dismissing PennDOT's contention here, we would quote Judge CRAIG, who stated in an earlier dispute concerning Contract No. 39630, that "we . . . reject PennDOT's attempt to dispute the authority of its own district office to authorize final design work to proceed. Westmoreland from the outset had a contract for *final design* approved by the central office, and was entitled to rely upon the district office as representing, and being answerable to, PennDOT's central office." *Westmoreland*, 63 Pa. Commonwealth Ct. at 325-326, 438 A.2d at 1010. PennDOT supports its argument that Mifflin had no authority to direct final design work to begin on the free-flow interchange with case law standing for the proposition that persons who contract with a government entity must, at their peril, know the extent of the authority of those negotiating the agreement. *Commonwealth v. Seagram Distiller's Corp.*, 379 Pa. 411, 109 A.2d 184 (1954). The case is inapposite, however, in that here we are not dealing with contract negotiations but with the actions of the very government official assigned to oversee the work performed under the contract.

to developing the right-of-way plans and argues that this work is not "incidential."

The pertinent sub-paragraphs of the "Scope of Work and Services" provision contained in Contract No. 50746 read as follows:

(a)  The Engineer [Westmoreland] shall prepare the plans specifications and estimates on L.R. 1015 Spur A, from Station 262+ to approximate [sic] Station 465± for a length of about 3.84 miles including an interchange with L.R. 117 at Station 435± and on L.R. 64125 connection from an intersection with L.R. 64125 at Station 116± to an interchange with L.R. 1015 Spur A at approximately Station 156±, a length of about 0.76 miles.  See Exhibit "D", Location Map.

(b)  *The scope of work is in Exhibits* [sic] *A*—and services as set forth in Exhibit A are to be performed in conformity with the provisions of the current Pennsylvania Department of Transportation Design Manual listed as follows: . . . .

Additionally, the "Scope of Agreement" provision included in Contract No. 50746 reads, in pertinent part, that: "This work is to be done in accordance with the following terms, conditions and provisions, as well as the Exhibits (listed below) which are attached hereto and *are made a part hereto of this Agreement.*"  The first item on the list reads "Exhibits [sic] A—Engineer's Proposal, dated April 30, 1973."

We are at a loss to understand how the Board could have determined that Exhibit A was not a contract provision defining the "Scope of Work" when Contract No. 50746 unambiguously states that "the scope of work is in Exhibits [sic] A."  We believe that

the Board's finding is in direct contravention of a basic principle of contract law which holds that parties have the right to make their own contracts and courts should not rewrite a contract or give it a construction in conflict with the plain meaning of the language agreed upon. *Pennsylvania Department of Transportation v. Brayman Construction Company,* 33 Pa. Commonwealth Ct. 485, 382 A.2d 767 (1978).

We also find that the Board erred in accepting evidence as to what occurred during the contract negotiations in order to determine the parties' intent in attaching "Exhibit A" to Contract No. 50746. Parol evidence is not admissible to alter or vary the terms of a contract which has been reduced to an integrated writing. *Rose v. Food Fair Stores, Inc.,* 437 Pa. 117, 262 A.2d 851 (1970).

Having determined that "Exhibit A" does, in part, define the "Scope of Work" under Contract No. 50746, we must still decide whether or not that scope of work includes final design for the free-flow interchange. And, in so doing, we believe that the parties' performance is crucial, *Atlantic Richfield v. Razumic,* for "Exhibit A" does not expressly contain any reference to final design plans in Section 3A although it does, of course, refer to the preparation of right-of-way plans.

PennDOT submits that the preparation of right-of-way plans entails the completion of *at least* sixty percent (60%) of the final design work. It asserts, therefore, that, in contracting for right-of-way plans, Westmoreland necessarily would have to proceed with final design work to the point at which the right-of-way plans could be drafted. PennDOT's argument, however, ignores the Board's finding that final design plans for the free-flow interchange in Section 3A had been underway since January or February 1972

(Board Finding of Fact No. 56) when J. H. Mifflin directed Westmoreland to begin development of final design plans for that interchange. We believe, therefore, that, while the final design work on Section 3A might normally have been included in an agreement for the preparation of right-of-way plans, the Board could have found here, based on substantial evidence, that, in Contract No. 50746, the parties bargained for the development of right-of-way plans *only* because the necessary final design work had begun under an earlier agreement. (Board Finding of Fact No. 57).[6]

The Board also awarded Westmoreland $41,310.55 for a design location study done pursuant to Contract No. 39630. PennDOT here contests only the Board's manner of calculating compensation for that study. It claims that the study constituted "extra work" under Contract No. 39360 and that, consequently, Westmoreland should be compensated by the rate established for extra work under that agreement, *supra* p. 289, rather than by the customary rate for preliminary engineering work: *i.e.* .0035 of the construction cost, which was used here by the Board.

Westmoreland counters with the argument that "extra work", as that term is used in Contract No. 39630, pertains only to extra final design work and that, since the study called for preliminary design work, the agreement did not establish a method of payment. It concludes, therefore, that the Board's deci-

---

[6] PennDOT submits throughout its brief that it presented ample evidence in support of its contention that the final design work in question was completed pursuant to Contract No. 50746 rather than Contract No. 39630. We remind PennDOT, however, that the issue is not whether it submitted ample evidence but whether the Board's findings are based on substantial evidence. Furthermore, the weight accorded to conflicting or contradictory evidence is for the Board to decide and not this Court. *Department of Transportation v. Acchioni & Canuso, Inc.*

sion to use the customary rate was fair and reasonable.

Contract No. 39360 provides, in pertinent part, that:

When the above work [referring to soil surveys, soil profiles, reports and tests, core borings, property investigations, and separate condemnation right-of-way plans authorized by PennDOT's Chief Engineer] is elected to be performed by the Engineer [Westmoreland] with his own forces or if he elects to perform with his own forces the following tasks, when directed by the Chief Engineer [PennDOT],

(1) Performance of extra work, *not specifically provided for or included in this contract,*

\* \* \*

the Engineer [Westmoreland] shall be paid an amount equal to the direct certified engineering payroll[7] plus the percentage allowances paid by the Engineer for Federal and State Unemployment Taxes, Workmen's Compensation Insurance and Engineer's [Westmoreland's] share of Social Security contributions, plus 100% thereof unless otherwise specified in the contract.

---

[7] Under Contract No. 39630, the direct certified engineering payroll "is limited to engineer type employees (engineers, draftsmen, members of field survey crews, engineering clerks, computors, estimators, and checkers; geologists, soils field sampling and laboratory technicians; property investigators; architects and landscape architects), when performing engineering work, on the project as provided for and specified within the Agreement [Contract No. 39630]." Additionally, the direct certified engineering payroll is calculated for any appropriate employee by multiplying the number of hours an employee spends on the project by a fraction whose numerator equals the employee's gross salary for the pay period and whose denominator equals the hours worked in the pay period.

We believe that the preliminary design work involved here, a design location study, arose out of PennDOT's decision to abandon the diamond-type interchange and replace it with a free-flow interchange. PennDOT directed Westmoreland to prepare the design location study together with the final design work for the new interchange. Clearly, the work here was not specifically provided for under this final design contract. Furthermore, the contract language does not specify that the term "extra work" refers only to final design "extra work." We believe, therefore, that the Board erred in calculating the compensation for the design location study, which we hold is "extra work," in a manner other than the one specified by Contract No. 39630. *Pennsylvania Department of Transportation v. Brayman Construction Company.*

Accordingly, we will affirm the Board's award of $347,338.96 plus six percent (6%) *per annum* from April 16, 1976 as compensation for final design work completed for L.R. 1015 Section 3A pursuant to Contract No. 39630, reverse the Board's award of $41,310.-55 plus six percent (6%) *per annum* from April 16, 1976 as compensation for a design location study of the free-flow interchange located in Section 3A of L.R. 1015 and order PennDOT to compensate Westmoreland for the design location study as "extra work" pursuant to Contract No. 39360 plus six percent (6%) *per annum* from April 16, 1976.

## Order

And Now, this 31st day of January, 1985, we hereby affirm the order of the Board of Claims awarding Westmoreland Engineering Company, Inc. compensation in the amount of $347,388.96 plus six percent (6%) *per annum* from April 16, 1976 for final design work completed pursuant to Contract No. 39360 on

Section 3A of L.R. 1015; reverse the order of the Board of Claims awarding Westmoreland Engineering Company, Inc. compensation in the amount of $41,310.33 plus six percent (6%) *per annum* for the design location study completed pursuant to Contract No. 39630 and order the Pennsylvania Department of Transportation to compensate Westmoreland Engineering Company, Inc. for the design location study as "extra work" under Contract No. 39630. Jurisdiction relinquished.