**In re CORNELL & COMPANY, INC., Debtor.**

**Cornell & Company, Inc., Plaintiff,**

**v.**

**Seaway Painting, Inc. and Delbert L. Smith Company, Inc., Defendants.**

**Bankruptcy No. 96–31650DAS. Adversary No. 98–374.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Jan. 21, 1999.

general contractor, and to further recover damages for costs and delay of completion of the project from the Defendant.

We hold, consistent with the Debtor's position, that the Defendant materially breached its contractual duties under the subcontract agreement, justifying the striking of the Defendant's proof of claim in its entirety. However, consistent with the Defendant's position, we further hold that contractually-approved pay-request forms for work actually performed resulted in final acceptance of the work in question; that no back-charges against the Defendant are justified; and that the Defendant has not been proven liable for delay of the entire project. Concluding that the Defendant performed about 86.4 percent of the contracted work rather than 70 percent, as the Debtor claims, or 96 percent as the Defendant claims, we measure the Debtor's damages for completing the unfinished contracted work at but $1,160.00.

Albert A. Ciardi, III, Philadelphia, PA, for debtor.

Paul A. Logan, King of Prussia, Pa, for Seaway Painting, Inc.

Robert V. Dell'Osa, Philadelphia, Pa, for Delbert L. Smith Co., Inc.

Lawrence J. Tabas, Phila., PA, for SEPTA.

Barry D. Kleban, Phila., PA, for Creditors' Committee.

Frederic Baker, Ass't. U.S. Trustee, Phila., PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us is the disposition of hopefully the last adversary proceeding ("the Proceeding") arising out of the complex bankruptcy case of a contractor, CORNELL & COMPANY, INC. ("the Debtor"). In the Proceeding the Debtor seeks to eliminate a proof of claim filed by DELBERT L. SMITH COMPANY ("the Defendant"), the assignee of the painting subcontractor on a large project on which the Debtor was the

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor is a construction company which was awarded, between February 12, 1991, and June 30, 1993, after competitive bidding, four contracts as the general contractor in performance of rehabilitation work on a main public transportation artery in the City of Philadelphia ("the City"), the Market–Frankford Elevated Railroad ("the El"), by the SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY ("SEPTA"). These contacts were designated as SCB–1, CB–2, CL–2D, CL–3S. A joint venture formed by the Debtor and another contractor, Buckley & Company, was awarded a fifth contract, designated as CL–4D.

On March 1, 1994, the Debtor entered into a subcontract agreement with SEAWAY PAINTING, INC. ("Seaway") for the structural steel painting work on, *inter alia*, the CL–2D project. During the performance of Seaway's subcontract work on other El projects Seaway advised the Debtor of its desire to assign, to the Defendant, the CL–2D project, for which the contracted price was $975,000, to which the Debtor consented.

On September 1, 1994, the Defendant began working on the CL–2D project and

worked continuously until just before Thanksgiving 1994, when SEPTA imposed an annual moratorium through Christmas to allow shoppers to fully utilize the El over the holidays. However, after the moratorium ended, weather restrictions inimical to the use of paint and primer prevented the Defendant from remobilizing to return to the project until March 14, 1995.

Shortly thereafter, the project experienced problems and delays associated with design errors, changes in federal lead-abatement standards, extra work, and changes in SEPTA's acceptance criteria for certain items of work. Because of the unforeseen added expenses due in large part to the lead-abatement standard charges, the Debtor began to experience the financial difficulties which led to its bankruptcy filing. As a result, it failed to make timely payments to the Defendant. Nevertheless, the Defendant continued to work on the project until advised by the Debtor to demobilize for that year's moratorium in late November 1995.

By March 1996, the Debtor became current on its payments to the Defendant, paying all sums due except for allowed retainage. On August 12, 1996, the Debtor installed the last precast deck sections and track work on the CL–2D project. Shortly after that, the Debtor asked the Defendant to remobilize to finish all of the remaining contracted work. The Defendant returned to the project in October 1996, but at that proceeded only to complete the punch lists produced by SEPTA. On October 3, 1996, the Defendant demanded a reduction in its outstanding retainage, as had allegedly been verbally agreed upon by the Debtor, as a condition of continuing its work. The Debtor refused, contending that the Defendant had not completed enough work on the project to warrant the requested reduction.

On November 13, 1996, having what it contended was only two days of work left to finish, but which it allegedly could not finish because certain tasks which had to precede the remaining work were undone, the Defendant permanently departed from the project. The Defendant refused thereafter to return in 1997, and the Debtor was compelled to hire Seaway to complete the work. Seaway ultimately completed the work, but billed the Debtor an additional $307,000 for its labors.

On December 2, 1996, the Debtor filed the voluntary petition for reorganization underlying the Proceeding pursuant to Chapter 11 of the Bankruptcy Code. Shortly thereafter, on February 4, 1997, Seaway filed a general unsecured claim in the amount of $342,053 for unpaid contractual balances on certain of the projects. About a year later, Seaway filed an amended general unsecured claim which included all of its work done on all of the projects in the amount of $571,026.08.

On April 15, 1998, the Debtor obtained confirmation of a plan of reorganization which compensated general unsecured creditors under one of two options: (1) an immediate payment of 25 percent of the claim; or (2) payment in full with interest over approximately ten years in installments. On or about May 14, 1998, the Defendant filed a general unsecured claim in the amount of $80,374.83 for unreleased retainage monies in the CL–2D project. In response to these claims, in the process of filing what appears to be the last of its objections to disputed claims, the Debtor, on July 2, 1998, filed objections to the claims of both Seaway and the Defendant and counterclaims thereto against the Defendant all together in the Proceeding.

Upon requests by Seaway to continue the trial and to stay it pending resolution of a proceeding in the District Court involving the same three parties and the Debtor's bonding company, this court, in an order of August 12, 1998, rescheduled the trial of the Proceeding on a must-be-heard basis for November 18, 1998. Two days before the trial, in an Order/Memorandum reported as *Seaway Painting, Inc. v. Cornell & Company, Inc.*, 1998 WL 800343 (E.D.Pa. Nov. 16, 1998), the District Court, per the Honorable Louis C. Bechtle, denied Seaway's motion to withdraw the reference of the Proceeding to the District Court.

At the outset of the trial, the Debtor and Seaway reported a settlement between them which, while not yet formally approved, we assume remains valid in rendering our within

decision. Apparently treating Seaway as having selected the first plan payment option, the Debtor agreed to pay Seaway $80,-525.85 on account of Seaway's unsecured claim of approximately $307,000 on the CL-2D project. Further, the Debtor agreed that any recovery of the remaining balance of the approximately $307,000, *i.e.*, the next $226,-474.15, from the Defendant, would be paid to Seaway. Any recovery from the Defendant in excess of $226,474.15 would be retained by the Debtor. Thus, in the ensuing trial of the Proceeding on November 18, November 19, November 20, and November 30, 1998,[1] the Defendant was the only active party defendant opposing a team of the Debtor and Seaway.

At trial, the Debtor called William R. Mitchell, a senior vice-president; Kevin W. Brockway, its chief financial officer; William Prettitore, a senior project manager for Wilson Management Associates as an expert in the construction industry with regard to delay damage claims; and Seaway called Thomas Repasky, a former supervisor on the project. The Defendant called Robert J. Seeberger, the Debtor's project engineer on all of the SEPTA projects; Lawrence Szemanski, its own former painting department vice-president; and, briefly, Vincent J. Kovach, a former structural steel painter with the Debtor and the former superintendent of the CL-2D project; and Donald Barker, the Defendant's project manager. Both parties' cases featured lists, charts, data, and memoranda in addition to testimony. After the completion of the trial, the parties agreed that the Debtor's brief would be submitted by December 11, 1998; and that the Defendant would file its opposing brief by December 24, 1998, to which deadlines both parties complied in rendering their respective submissions.

In its brief, the Debtor asserts that the Defendant's proof of claim should be denied because it had not completed the subcontract work, forcing the Debtor to retain a new contractor to finish the work involved at a

significant additional cost. Apparently, the Debtor deduced from Seaway's large bill exceeding $300,000 that the Defendant only completed seventy (70%) percent of the painting work. Further, the Debtor maintains that the progress payments made to the Defendant neither constituted acceptance of the work performed nor operated as a waiver of complaints regarding deficient or incomplete work. Next, the Debtor argues that the Defendant is due over $40,000 on account of back-charges and is responsible for costs incurred due to the lapse of the work. Finally, the Debtor argues that the delay in painting caused by the Defendant's actions resulted in delay of the entire project, thus justifying an award of additional delay damages of $934,420 in its favor.

The Defendant, on the other hand, argues as follows: (1) it completed at least ninety-six (96%) percent of its subcontract work by November 1995; (2) the Debtor consistently failed to make timely payments to it; (3) prior to 1997, the Debtor never complained that the Defendant billed for more work than it had actually completed; (4) the Debtor did not comply with the subcontract requirements for assessment of back-charges, thus eliminating its right to same; (5) its refusal to return to the CL-2D project was justified; (6) it was not liable for the work Seaway did; (7) it was not responsible for the delay of the entire El project; and (8) at least $146,806.02 remains payable to it on the painting subcontract, claiming that it performed extra work for which it was not compensated.

### C. DISCUSSION

1. *The Defendant's Proof Of Claim for Unreleased Retainage Monies Must Be Disallowed Because the Defendant's Contractual Obligations Were Unjustifiably Not Completed.*

At issue is whether a proof of claim for unreleased retainage monies due under the terms of a contract should may allowed

---

1. The Defendant was accorded an opportunity to present rebuttal to the Debtor's expert on delay damages ten days after the completion of the rest of the trial to cure the Debtor's failure to provide an expert report to the Defendant prior to trial.

*But see* Local Bankruptcy Rule 7026-1(a) (effective February 1, 1999) (Federal Rule of Civil Procedure 26(a) will no longer apply to proceedings in this court).

where the claimant failed to complete its contractual obligations. The determination of this issue requires interpretation of several principles of general contract law, 11 U.S.C. § 502(a) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3001(f).

The Debtor argues that the Defendant's proof of claim lacks merit because, in order for the Defendant to receive the requested retainage amounts, the Defendant would need to establish that it completed the subcontracted work. The Debtor notes that the Defendant never completed the final painting of certain "bents" or the new steel provided under the contract, nor did it supply a final power-washing, nor did it provide a warranty for the work done, all of which were mandated by the subcontract. It also contends that the Defendant failed to complete about thirty (30%) percent of the work involved, based mainly on the fact that Seaway's billing of $307,000 constituted approximately that portion of the entire contract price at $975,000.

The Defendant, on the other hand, maintains that at least ninety-six (96%) percent of contracted work was completed by November 1995. It also maintains that, since the Debtor consistently failed to make timely payments, its refusal to return to work to the project after November 13, 1996, was justified.

■ We believe that the Debtor's general position with respect to the disallowance of the claim, if not its claims regarding the amount of work completed and many of its figures, appears correct. Under Pennsylvania law "[t]he paramount goal of contract interpretation is to ascertain and give effect to the parties' intent." *Polito v. Polito*, 440 Pa.Super. 328, 332, 655 A.2d 587, 589 (1995).

Thus, if the language of a contract is clear and unambiguous, the intent of the parties is to be derived only from the express language of the contract. *See, e.g., In re Labrum & Doak, LLP*, 227 B.R. 391, 401 (Bankr. E.D.Pa.1998); and *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs' Ass'n Ins. Co.*, 512 Pa. 420, 426, 517 A.2d 910, 913 (1986). Further, it should be noted that we are obliged to adopt an interpretation of the contract that is reasonable and probable in light of the parties' intent. *See, e.g., Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 173 (7th Cir.1996); and *Marcinak v. Southeastern Greene School Dist.*, 375 Pa.Super. 486, 491, 544 A.2d 1025, 1027 (1988).

The instant CL–2D subcontract agreement specified a base contract price of $975,000. Its terms expressly required the defendant to (1) clean, prime, and final coat *all* required steel at the Berks Station, the York–Dauphin Station, and "bents" 177 to 250; (2) final coat *all* new steel and drain pipes; and (3) perform repair work on 2,000 square feet of "stringers." The subcontract agreement also required the Defendant to complete the project in its entirety by September 18, 1995, and to thereafter provide a warranty for all the work performed. We think the conclusion is inescapable that the contract as drafted necessarily implied and gave the Debtor assurance that the Defendant would perform these obligations in their entirety and was made with the understanding that the project would be completed and warranted by a given date.

We further hold, as illustrated by TABLE 1 below, that the Defendant failed to complete a substantial portion of the work in question as mandated by the subcontract agreement:

| TABLE 1 PAY REQUEST ANALYSIS | | | |
|---|---|---|---|
| TOTAL AMOUNT OF MONIES CLAIMED BY THE DEFENDANT IN ITS PAY-REQUEST FORMS | PERCENTAGE OF CONTRACT VALUE AS OF 11/96 ($975,000.00) | TOTAL AMOUNT OF MONIES ACTUALLY PAID TO THE DEFENDANT | PERCENTAGE OF CONTRACT VALUE AS OF 11/96 ($975,000.00) |
| $886,645.00 | 90.94% | $842,535.00 | 86.41% |

Thus, despite the parties' claims of a high of ninety-six (96%) percent completion on the part of the Defendant, and but seventy (70%) percent on the part of the Debtor, our scrutiny of the monies paid to the Defendant from October 1994 through October 1996 reveals that the Defendant completed 86.41% of the subcontract work involved.

In light of this conclusion, there is no question that the Defendant's failure to perform any further work on the CL–2D project pursuant to the terms of the agreement, except for performance of the punch list work required by SEPTA in October and November 1996, evidenced the Defendant's breach of its agreement with the Debtor. Moreover, the Defendant's abandonment of the project after November 13, 1996, conclusively established the Defendant's material breach of the subcontract agreement.

It is well settled that when a party materially breaches a contractual agreement, the non-breaching party is not required to fulfill its duties under the contract. *See, e.g., Slagan v. John Whitman & Associates,* 1997 WL 587354, at *5 (E.D.Pa. Sept. 10, 1997). As a result, a party who has materially breached a contract may not complain if the other party refuses to perform its obligations under the contract. *See, e.g., Begier v. Price Waterhouse,* 1992 WL 236175, at *4 (E.D.Pa. Sept. 14, 1992); *United Hospitals, Inc. v. Comprehensive Care Corp.,* 1991 WL 125902, at *4 (E.D.Pa. June 26, 1991); *Ott v. Buehler Lumber Co.,* 373 Pa.Super. 515, 518, 541 A.2d 1143, 1145 (1988); and *Kennedy v. E.W. Rothrock Co.,* 261 Pa. 580, 587, 104 A. 746, 748 (1918). Since it breached the contract, the Defendant is not entitled to request nor recover from the Debtor the obligation of the release of the retainage monies. Nor has it proven that it performed extra work on the project which the Debtor agreed to compensate over and above the $975,000 contract price. In fact, the Debtor's refusal to agree to the Defendant's demands for same was a contributing factor in its leaving the job.

The Defendant maintains that it was justified in not performing the agreement in question as a result of the Debtor's failure to make certain that other work necessary to be completed prior to the Defen-

dant's painting was done and of course to make timely payments. We find little merit in these arguments. The prerequisite work was ultimately completed, but even then the Defendant simply refused to return until paid its retainage, which was not yet due to it. Delay in making payment where the amount of the work done is disputed or is being negotiated is not on that basis alone a breach of contract. Rather, a breach occurs on the part of the subcontractor where that party unilaterally, as here, leaves a job site without completing its contractual duties. *See, e.g., In re Northup–Johnson, Inc.,* 15 B.R. 767, 769–770 (Bankr.D.Md.1981); and *In re Fordson Engineering Corp.,* 25 B.R. 506, 510 (Bankr.E.D.Mich.1982). Further, it was demonstrated at trial that, as of March 1996, the Debtor was current on its payment obligation to the Defendant, having paid all but the retainage, which was not yet due. Therefore, by November 13, 1996, when the Defendant declared that it intended to depart and not return, such a basis no longer constituted a justifiable reason for its continual refusal to perform under the instant contract, assuming that it ever did.

In light of this analysis, it is quite simple for us to determine whether the claim at issue constitutes a valid proof of claim against the Debtor's estate. Properly filed proofs of claim are prima facie evidence of the validity and amount of the claim, absent any objection by a party in interest. *See* 11 U.S.C. § 502(a); F.R.B.P. 3001(f); and *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir.1992). The burden of going forward with evidence to dispute a filed claim is on the objector, who must present evidence sufficient to rebut the prima facie claim. *Id.* To potentially succeed, the objector must present evidence which would refute allegations essential to sustain the proof of claim. *Id.* at 173–74. However, if the objector does so, the ultimate burden of proving the validity of the claim reverts to the claimant. *Id.* at 174.

In the trial of the instant Proceeding, the Debtor presented sufficient evidence to demonstrate that it was not required to release the retainage monies being withheld, which the Defendant sought in its claim. This evidence rebutted the prima facie claim filed by

the Defendant. Hence, it then devolved upon the Defendant to prove its claim by a preponderance of the credible evidence. The Defendant, however, failed to prove that

(1) it performed its contractual obligations in its entirety. In fact, the evidence presented at trial showed that the Defendant did not: (a) clean, prime, and final coat all required steel; (b) final coat all new steel; or (c) finish repair work on "stringers," as required under the express terms of the subcontract agreement;

(2) it provided a warranty for the work performed. Again, the evidence presented at trial showed that the Defendant failed to warrant the work performed as mandated by the subcontract agreement; and

(3) it was justified in abandoning the project. The trial testimony of Mitchell showed, by a preponderance of the evidence, that as of March 1996, the Debtor became current on its payments to the Defendant except for retainage.

Finally, the Defendant conceded at trial that it failed to complete certain items mandated by the subcontract agreement. Given the evidence presented, we cannot ignore the fact that the Defendant failed to overcome the Debtor's contentions that the Defendant materially breached its contractual obligations under the subcontract.

Under Pennsylvania law, a party who has materially breached a contract may not complain if the other party thereafter refuses to perform its obligations under the contract. *Ott, supra,* 373 Pa.Super. at 518, 541 A.2d at 1145. Stated another way, a party at breach has no valid claim against the other party. Since the Defendant failed to introduce any persuasive evidence that would defeat the Debtor's contention that it failed to complete the contract and hence was not entitled to the remainder of the contract price under the requisite "preponderance of the evidence" standard, we must conclude that the claim at issue, based on the Defendant's assertion of an entitlement to the contract balance, must be stricken in its entirety. Since we cannot sustain the proof of claim as filed, it follows that we cannot in any sense approve the

Defendant's efforts to enhance the claim to $146,806.02 or any sum in excess of the claim filed, particularly as there is no evidence supporting the Debtor's agreement to pay any increased amount.

*2. The Defendant Nevertheless Correctly Argues that the Approved Progress Payments Made to It in the Course of the Work Performed Constituted Final Acceptance of the Work Submitted.*

Having decided that the Defendant is not entitled to any claim against the Debtor, the only issues remaining address the subject of whether the Debtor is entitled to any recoveries against the Defendant. A threshold issue in this inquiry is whether contractually-approved pay-request forms submitted on account of work actually performed by the Defendant should be deemed to constitute final acceptance of the work in question. The determination of this issue requires interpretation of Item XI of the Prime Contract, and Articles 4.1.5 and 11.6 of the Subcontract Agreement, which read as follows:

### ITEM XI

### *TIME*

**A. Definitions**

. . .

**3.** The date of completion of the work or any designated portion thereof is the date certified by the Project Manager when the Work delivered by the Contractor is complete and has been accepted by SEPTA. The work will not be considered complete under this contract until it has been accepted by SEPTA.

. . .

### ARTICLE 4

### *SUBCONTRACTOR*

**4.1. EXECUTION AND PROGRESS OF THE WORK**

. . .

**4.1.5.** The Subcontractor agrees that the Contractor or the Owner/Owner's Agent will have the authority to reject Work

which does not conform to the requirements of the Prime Contract. The Owner/Owner's Agent's decisions on matters relating to aesthetic effect shall be·final if consistent with the intent expressed in the Prime Contract.

. . . .

## ARTICLE 11

### *PROGRESS PAYMENTS*

. . .

**11.6.** Applications for payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the application for payment.

. . .

The Debtor maintains that progress payments made to the Defendant in the course of work ostensibly performed did not constitute acceptance of the work in question in light of the subsequent determination that additional work was required. At the same time, the Debtor asserts that, as of the time that the Defendant abandoned the CL–2D project, none of the work ostensibly performed by the Defendant had been fully accepted by either the Debtor or SEPTA. To support these arguments, the Debtor purports to rely on (1) the express terms of the subcontract agreement, which incorporated by reference all the terms and conditions stipulated in the Prime Contract between the Debtor and SEPTA; (2) the testimony of Mitchell, among others; and (3) two Pennsylvania decisions, *Commonwealth Dep't of Transp. v. American States Ins. Co.,* 138 Pa.Cmwlth. 11, 588 A.2d 1320 (1990); and *General State Authority v.. Kline,* 29 Pa. Cmwlth. 232, 370 A.2d 402 (1977). Furthermore, the Debtor adds the arguments, apparently in anticipation of the Defendant's position to the contrary, that acceptance of the work performed does not operate as a waiver or estoppel to deficient or incomplete work, citing *Walter v. North Hills School District,* 87 Pa.Cmwlth. 302, 305, 487 A.2d 85, 88 (1985); and *Waddell v. Department of Transp.,* 686 A.2d 867 (1996), *appeal denied,* 548 Pa. 676, 698 A.2d 598 (1997). Finally, the

Debtor observes that the subcontract agreement clearly allows recovery of monies already paid in case of overpayment, as long as SEPTA has not accepted the pay-request forms and additional work is required.

The Defendant, on the other hand, observes that SEPTA would not approve progress payment applications to any subcontractor unless SEPTA's Construction Manager, Philadelphia Transit Consultants ("PTC"), agreed that the subcontractor had properly performed and actually completed the work for which it was seeking payment. To support this observation, the Defendant relies on the testimony presented at trial and the testimony of, *inter alia,* Repasky regarding PTC's rigorous inspection practices. Next, the Defendant argues that approval of its applications resulted in final inspection and acceptance of the work actually performed. Further, the Defendant maintains that SEPTA fully accepted and approved six (6) of the nine (9) pay-request application forms submitted by the defendant between September 1994 and September 1996. Finally, the Defendant asserts that the work performed was done properly, as evidenced by the Debtor's own documents and testimony concerning PTC's rigorous inspection practices.

We believe that the Defendant's position with respect to the acceptance question appears correct. As noted in the authorities referenced at page 102 *supra,* it is well settled under Pennsylvania law that, when interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract. It is also well established that the strongest external sign of agreement between contracting parties is the words that they use in their written contract. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). Thus, the sanctity of the written words of the contract is embedded in the law of contract interpretation. *See Labrum & Doak, supra,* 227 B.R. at 401.

In the instant case, we conclude that the express language of Item XI of the Prime Contract clearly and unequivocally provides that work actually performed by a given subcontractor must be deemed com-

pleted when SEPTA has accepted same. In that regard, Article 11.6 of the subcontract expressly requires each subcontractor to submit a pay-request application form indicating the portion of the work completed as of the end of the period covered by the application for payment. The Debtor would then meet with SEPTA and PTC to review the application submitted. At trial, the evidence presented clearly showed that at those meetings SEPTA either

(1) accepted that the subcontractor had actually completed the amount of work for which it was requesting payment, thereby approving full payment of the application submitted; or,

(2) denied that the subcontractor had completed the amount of work claimed,

authorizing payment of a lesser amount.

The evidence and testimony presented at trial also established that SEPTA's views concerning the amount of work actually completed were based on the rigorous on-site reports performed by PTC's field inspectors, per the testimony of Seeberger, Szemanski, Kovach, and Barker, as well as that of Repasky.

As illustrated by TABLE 2 below, the evidence and testimony presented at trial showed that the Defendant submitted a total of nine (9) pay-request application forms as mandated by Article 11.6 of the subcontract agreement with the following respective results:

**TABLE 2**
**PAY-REQUEST APPLICATION FORMS**

| REQUEST DATE | NATURE OF WORK | TIME-PERIOD COVERED | CONTRACT VALUE | SEPTA/PTC ACTION | FOLLOW-UP ACTION BY THE DEFENDANT |
|---|---|---|---|---|---|
| 10/21/94 | CONTRACT ITEMS | 09/05/94 10/21/94 | $ 64,125.00 | FULLY ACCEPTED AND APPROVED | NONE |
| 11/23/94 | CONTRACT ITEMS | 10/22/94 11/22/94 | $127,278.00 | FULLY ACCEPTED AND APPROVED | NONE |
| 04/27/95 | CONTRACT ITEMS | 04/01/95 04/28/95 | $ 60,750.00 | FULLY ACCEPTED AND APPROVED | NONE |
| 05/31/95 | CONTRACT ITEMS | 05/01/95 05/31/95 | $ 33,750.00 | FULLY ACCEPTED AND APPROVED | NONE |
| 06/28/95 | CONTRACT ITEMS | 06/01/95 06/28/95 | ($168,498.00) $148,248.00 | DENIED, PAYMENT AUTHORIZED FOR LESSER AMOUNT | DEFENDANT FULLY COMPLIED WITH SEPTA/PTC |
| 07/24/95 | CONTRACT ITEMS | 06/29/95 07/24/95 | $ 73,764.00 | FULLY ACCEPTED AND APPROVED | NONE |
| 08/24/95 | CONTRACT ITEMS | 07/24/95 08/24/95 | ($182,160.00) $168,300.00 | DENIED, PAYMENT AUTHORIZED FOR LESSER AMOUNT | DEFENDANT FULLY COMPLIED WITH SEPTA/PTC |
| 09/25/95 | CONTRACT ITEMS | 08/25/95 09/25/95 | $166,320.00 | FULLY ACCEPTED AND APPROVED | NONE |
| 10/96 | RETAINAGE | 08/25/96 09/25/96 | $ 10,000.00 | NO ACTION TAKEN | NONE |
| **TOTAL AMOUNT APPROVED FOR PAYMENT** | | | | | **$842,535.00** |

As this TABLE indicates, there is no doubt that SEPTA fully accepted the first four pay-request application forms submitted by the Defendant. In fact, Seeberger testified at trial that he approved full payment of these application forms because SEPTA agreed that the Defendant had successfully completed all the work for which it was billing. Obviously, SEPTA had no doubts in accepting same because, as demonstrated at

trial, PTC would not have approved the Defendant's applications for payment if PTC had believed that the Defendant's work was deficient in any way. SEPTA, on the other hand, did disagree somewhat with the Defendant's fifth request form and made some revisions as outlined by PTC's on-site inspection report. Pursuant to Article 4.1.5 of the subcontract agreement, the Defendant accepted the revisions presented and then payment was made. Then, as with the first four, SEPTA accepted and fully approved the Defendant's sixth pay-request form. Shortly thereafter, SEPTA disagreed slightly with the Defendant's seventh pay-request form. Again, the Defendant made the requested revisions and payment was fully approved. The Defendant's eighth pay-request application form was accepted and approved in full by SEPTA. As TABLE 2 indicates, most of the work performed by the Defendant was thus indeed accepted and approved by the Debtor, PTC, and SEPTA.

Furthermore, as the facts presented above demonstrate, the approval of the pay-request forms submitted by the Defendant constituted acceptance of the work performed as intended by the express language of the Prime Contract. *See, e.g., Verona Construction Co. v. Lower Merion Township*, 413 Pa. 619, 622–623, 198 A.2d 559, 560 (1964). Thus, a natural construction of Item XI indicates that contractually approved pay-request forms for work actually performed resulted in final acceptance of the work in question.

The arguments and authorities cited by the Debtor cannot overcome these conclusions. The express language of Item XI clearly and unequivocally provides that work actually performed by a given subcontractor will not be considered ultimately completed until SEPTA has accepted the same. However, most of the pay-request forms submitted by the defendant *were* accepted and approved by SEPTA.

The *American States* and *Kline* holdings have little bearing on the issues at hand. *American States* examined only the duty of a former contractor to defend and indemnify the Department of Transportation for a tort claim arising out of an accident which occurred after completion of a contract agreement. *Kline* dealt solely with statute of limitations and specific performance questions. Similarly, the *Walter* and *Waddell* holdings have nothing to do with the issues in question. Although the Debtor cited these cases to destroy the straw man of a waiver and/or estoppel defense, the Defendant invoked no such defenses.

Finally, the Debtor's contentions that the subcontract agreement clearly allows recovery of monies already paid, as long as SEPTA has not accepted the project and additional work is required, has no merit in the case at bar because SEPTA did indeed accept the applications presented. Therefore, SEPTA agreed that the Defendant had in fact successfully completed all the work for which it was billing. SEPTA's actions proved that the work performed was done properly and the payments requested were authorized for work actually performed.

We therefore reject the notion that the Debtor, at this point, can validly argue that the work performed by the Defendant was defective or incomplete and that any damages are payable to it or Seaway on this basis.

*3. The Defendant Was Not Liable for the Alleged Delay Damages or for Back–Charges in Its Performance of the Contract.*

The Debtor also vigorously contends that the Defendant is liable for substantial damages for causing the delay of completion of the entire El contract, and for certain back-charges relating to the work done. The determination of these issues requires analysis of the testimony and evidence presented at trial, a close scrutiny of the damage amounts claimed by the Debtor, and interpretation of Article 3.4.1 of the subcontract agreement, which reads as follows:

**ARTICLE 3**

***CONTRACTOR***

. . .

**3.4. CONTRACTOR'S REMEDIES**

**3.4.1.** If the Subcontractor defaults or neglects to carry out the Work in

accordance with this Agreement, and fails within three (3) working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after three (3) working days following receipt by the Subcontractor of an additional written notice, and without prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the cost thereof from the payments then or thereafter due the Subcontractor, provided however that if such action is based upon faulty workmanship or materials and equipment, the Contractor or the Owner/Owner's Agent shall first have determined that the workmanship or materials and equipment are not in accordance with the requirements of the Prime Contract.

. . .

The Debtor asserts that it suffered substantial damages as a result of the Defendant's delay in completion of the subcontract. To support this argument, the Debtor relies on the trial testimony of Mitchell and of its expert Prettitore. Specifically, the Debtor contends that the Defendant's actions caused an eleven-month delay in the completion of the CL–2D project from November 1996 through its actual completion in October 1997, much of which arose from certain additional field overhead costs. These damages are listed as follows:

| TABLE 3 DELAY DAMAGES | | |
|---|---|---|
| NATURE OF DAMAGE INVOLVED | | DOLLAR AMOUNT |
| (1) FIELD OVERHEAD COSTS | = | $ 215,533.00 |
| (2) COUNTERCLAIM DAMAGES (SEPTA) | = | $ 495,517.00 |
| TOTAL DELAY DAMAGES | = | $ 711,050.00 |

Next, as outlined by Prettitore's report, the Debtor lists the amounts paid on the subcontract agreement as follows:

| TABLE 4 AMOUNTS PAID ON CL-2D PROJECT | | |
|---|---|---|
| NATURE OF COST INVOLVED | | DOLLAR AMOUNT |
| (1) BASE CONTRACT PRICE | = | $ 980,374.64 |
| (2) CONTRACT COSTS<br><br>(a) PAYMENTS MADE TO THE DEFENDANT ($852,535.00)<br>(b) BACK CHARGES ASSIGNED TO THE DEFENDANT ($42,313.79)<br>(c) DEDUCTIBLE FOR GENERAL LIABILITY CLAIM ($5,000.00) | = | ($ 899,848.79) |
| AMOUNT REMAINING TO BE PAID ON SUBCONTRACT AGREEMENT | = | $ 80,525.85 |

Finally, the Debtor observes that the costs incurred in order to complete the work that the Defendant failed to perform exceeded the amount remaining to be paid to the Defendant under the subcontract agreement. These costs are listed as follows:

| TABLE 5 | | |
|---|---|---|
| COMPLETION COSTS PAID ON CL-2D PROJECT | | |
| NATURE OF COST INVOLVED | | DOLLAR AMOUNT |
| (1) AMOUNT BILLED BY THE DEFENDANT | = | $ 936,000.00 |
| (2) AMOUNT PAID TO THE DEFENDANT | = | ($ 852,000.00) |
| (3) OUTSTANDING BALANCE TO BE PAID | = | $ 84,000.00 |
| (4) AMOUNT ACTUALLY SPENT TO COMPLETE THE PROJECT<br><br> (a) AMOUNT BILLED BY SEAWAY $226,920.18<br> (b) AMOUNT REMAINING TO BE PAID ON SUBCONTRACT AGREEMENT $80,525.85 | = | ($ 307,446.03) |
| ADDITIONAL AMOUNTS PAID ON CL-2D COMPLETION | = | $ 223,446.03 |

Then, the Debtor concludes that the costs associated with the delay damages ($711,050.00) incurred and the additional completion costs ($223,446.03) paid are the sole responsibilities of the Defendant. Thus, the Debtor contends that the Defendant is liable for $934,496.03 in delay damages.

The Defendant, not surprisingly, disputes these arguments offered by the Debtor. According to the Defendant, the delays in question were attributable to either the Debtor or to SEPTA, not to it. Among the arguments presented are the following:

(1) the Debtor agreed that the Defendant's work was substantially delayed by causes beyond the Defendant's control and that the Defendant would have completed its work in 1995 but for those delays;

(5) the Debtor claimed that its work was delayed substantially by many causes unrelated to the painting work; and

(6) nothing prevented Seaway from returning to the project sooner than July 30, 1997, which would have resulted in a completion date at least several months sooner than October 1997.

Further, the Defendant asserts that it is not responsible for whatever work Seaway did, much of which was over and above what it was required to do to complete the project. According to the Defendant, the evidence and testimony presented at trial showed that

the Defendant had properly completed ninety-six (96%) percent of its work by November, 1995, and thus little paint work was left to be done as of August, 1996, and even less work remained as of 1997. It argues that the overwhelming majority of Seaway's work was either work that was beyond the scope of the subcontract agreement, i.e., extra work, or work done to repair damage caused by the Debtor, the weather, and/or others to the Defendant's work over the intervening two years. Thus, it contends that it is neither responsible nor liable for the additional completion costs associated with the CL-2D project.

We believe that the Defendant's position with respect to the delay damages incurred appears for the most part correct. A detailed analysis of the evidence and testimony presented at trial reveals that the eleven-month delay in the project completion which the Debtor now claims was attributable to the Defendant may have occurred irrespective of the actions of the Defendant. An examination of the numerous delays incurred in the year 1995 supports this conclusion:

(1) On February 6, 1995, the defendant was delayed as a result of the implementation of the new OSHA standard for "Fall Protection." According to the Debtor's project engineer, the standard in question imposed additional re-

straints on the defendant's workers, thereby impeding their mobility and reducing their productivity;

(2) On March 3, 1995, while complying with the new Lead Regulation requirements implemented by OSHA, the Defendant experienced a significant loss in worker productivity. At trial, these losses were attributed to significant additional start up time to gather and dress into protective clothing; gather and set up, maintain, and repair all sorts of equipment; and additional time required for added breaks due to employee stress and heat. The Debtor itself calculated that the Defendant's work was delayed by eight (8) weeks on account of these factors;

(3) On March 29, 1995, the Debtor improperly removed the Defendant's temporary staging platform at Berks Station. The Debtor admitted its fault and agreed to pay for the damaged turnbuckles and supply labor and a crane to assist in re-erecting the platform. The Defendant spent four weeks repairing and re-erecting the same.

(4) On May 18, 1995, the Defendant experienced additional delays as a result of PTC's rigorous inspection standards. The evidence at trial showed that the standards in question delayed the project by sixteen (16) days;

(5) On June 21, 1995, the Defendant experienced more delays as a result of the Debtor's failure to remove excess concrete from the lips, faces, and edges on the bents of the CL–2D project; and

(6) On August 31, 1995, the Defendant was delayed by the Debtor's failure to cooperate in scheduling the latter's own work.

As can be noted from examining the foregoing, the CL–2D project experienced problems and delays associated with design errors, changes in federal lead abatement standards, extra work, and changes in SEPTA/PTC's acceptance criteria for certain items of work. These problems and delays were neither created nor produced by the Defendant. Indeed, Mitchell himself conceded, in a September 29, 1996, written communication to the Debtor's bonding company, that "D.L. Smith was delayed from finishing their [sic] contract through no fault of D.L. Smith or Cornell & Company, Inc., for some eleven months." Thus, after examining the evidence and testimony presented at trial, we conclude that the Defendant is not liable for any of the $711,050.00 in costs allegedly constituting the delay damages at issue.

■ With respect to the back-charges claimed, we also believe that the Defendant's position that such changes are contractually impermissible appears correct. Earlier in our discussion, we examined two fundamental principles of general contract law at pages 102, 105–06 *supra*. First, when interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract. *See Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 837 (3d Cir.1995), quoting *Commonwealth Dep't of Transp. v. Manor Mines, Inc.,* 523 Pa. 112, 119, 565 A.2d 428, 432 (1989); and *Z & L Lumber Co. of Atlasburg v. Nordquist,* 348 Pa.Super. 580, 585, 502 A.2d 697, 699 (1985). Second, the strongest external sign of agreement between contracting parties is the words that they use in their written contract. *See Mellon Bank, supra,* 619 F.2d at 1009. Applying these principles to the issue at hand, we conclude that the Debtor's back-charge counterclaims must fail. The reason is that the express words of Article 3.4.1 quoted at page 108 *supra,* clearly and unequivocally provide a specific mechanism to recover the charges in question. In accordance therewith, the Debtor was required to provide two written notices to the Defendant before the charges listed below could be allowed.

The specific back-charges requested are reflecting in the following table:

| TABLE 6 | | | |
|---|---|---|---|
| **BACK CHARGE LIST** | | | |
| NO. | NATURE OF BACK-CHARGE | | CURRENT DOLLAR VALUE |
| B/C # 38-1 | Labor & equipment required to clean out drainage at bent. | ≈ | $ 415.74 |
| B/C # 38-2 | Labor & equipment required to clean area. | ≈ | $ 216.95 |
| B/C # 50-1 | Labor & equipment required to remove the Berks St platform. | ≈ | $10,208.38 |
| B/C # 50-2 | Crane service requested by defendant. | ≈ | $ 478.50 |
| B/C # 50-3 | Labor & equipment required to maintain the Berks St platform. | ≈ | $ 171.09 |
| B/C # 50-4 | Labor to repair Berks St platform. | ≈ | $ 724.05 |
| B/C # 58-1 | Painting cost for Seaway Painting, Inc. | ≈ | $ 8,984.60 |
| B/C # 58-2 | Painting cost for Seaway Painting, Inc. | ≈ | $ 6,996.57 |
| B/C # 58-3 | Painting cost for Seaway Painting, Inc. | ≈ | $ 7,345.37 |
| B/C # 58-4 | Painting cost for Seaway Painting, Inc. | ≈ | $ 3,256.55 |
| B/C # 71-0 | Protection of electrical facilities. | ≈ | $ 5,043.83 |
| **TOTAL AMOUNT OF BACK-CHARGES** | | | **$ 43,841.63** |

As the evidence and testimony presented at trial showed, the Debtor failed in all eleven instances to follow the express language of the subcontract and provide the required notices. Under Pennsylvania law, a party's failure to comply with the express prerequisites in a contract for claiming back-charges precludes recovery for same as a matter of law. *See Lardas v. Underwriters Ins. Co.* 426 Pa. 47, 49, 231 A.2d 740, 741 (1967); *General State Authority v. Planet Ins. Co.*, 300 A.2d 926, 927 (Pa.Cmwlth.1973); and *Central Penn Industries, Inc. v. Commonwealth Dep't of Transp.*, 25 Pa.Cmwlth. 25, 32, 358 A.2d 445, 449 (1976). For this reason, the Debtor's back-charge counterclaims, like its delay-damage claims, must be stricken in their entirety.

*4. The Defendant Is Liable for Only a Small Portion of the Debtor's Counterclaims When the Correct Measurement Formula Is Applied to the Correct Figures.*

With respect to the remaining general completion-cost counterclaims, we believe that the Debtor's position appears theoretically correct, but that its measurement is incorrect due to the use of many inaccurate figures. Put another way, we find that the Debtor demonstrated throughout the Proceeding that the Defendant's failure to complete the work in question resulted in a material breach of the subcontract agreement. Accordingly, the Defendant cannot

succeed in its claim for the unpaid contract balance and it is liable for damages which are proven. However, the Debtor's proof of damages is flawed by the use of incorrect legal principles and inaccurate numbers.

 The central principle of the law regarding contractual damages is that the non-breaching party should be placed in the position it would have been absent the breach. *See Trosky v. Civil Service Com'n, City of Pittsburgh,* 539 Pa. 356, 364, 652 A.2d 813, 817 (1995); *Maxwell v. Schaefer,* 381 Pa. 13, 21, 112 A.2d 69, 73 (1955); *Harman v. Chambers,* 358 Pa. 516, 521, 57 A.2d 842, 845 (1948); and *Pennsylvania Dep't of Transp. v. James D. Morrissey, Inc.,* 682 A.2d 9, 14 (Pa.Cmwlth.1996). The courts of this Commonwealth, consistently therewith, have generally measured damages for incomplete or defective performance of a construction contract by determining the cost of completing the work or correcting the defects by another contractor. *See Douglass v. Licciardi Construction Co.,* 386 Pa.Super. 292, 297, 562 A.2d 913, 915–16 (1989); *Ecksel v. Orleans Construction Co.,* 360 Pa.Super. 119, 132–133, 519 A.2d 1021, 1028 (1987); *Steinhauer v. Wilson,* 336 Pa.Super. 155, 159, 485 A.2d 477, 479 (1984); and *Brourman v. Bova,* 198 Pa.Super. 279, 281, 182 A.2d 245, 246 (1962).

 However, this mode of measurement is applied rigorously only where the original breaching party has substantially finished the work and where the non-breaching party has completed payment to the party at breach. *See Oelschlegel v. Mutual Real Estate Investment Trust,* 429 Pa.Super. 594, 600, 633 A.2d 181, 184 (1993). As completed payment was not, with justification, made here, this case therefore calls for a slightly different method of calculation. *Id .* We hold that the correct measure of damages here is set forth, at *id.,* as follows:

> "[T]he measure of an owner's damages for a construction contractor's breach is the cost of completing the contract or correcting the defective work, *minus* the unpaid part of the contract price." Annotation, *Modern Status of Rule as to Whether Cost of Correction or Difference in Value of Structures is Right Measure of Damages for a Construction Contract,* 41 A.L.R.4th

131 § 15 (1985). *See also, Brourman, supra,* 198 Pa.Super. at 282, 182 A.2d at 247.

Thus, the cited authorities indicate that the proper method of calculating damages for incomplete or defective performance is to use the cost of completing work or correcting defects by another contractor. *See, Douglass, supra; Ecksel, supra;* and, *Steinhauer, supra.* However, in none of these cases was there an indication that an amount remained unpaid on the construction contract at issue, as is the case here. In *Brourman, supra,* 198 Pa.Super. at 282, 182 A.2d at 247, which did involve an unpaid balance on the breached contract, the Superior Court recognized that the unpaid amount must be subtracted from the cost of completion in order to award damages to the non-breaching party.

A close scrutiny of the evidence and testimony presented at trial reveals that the Debtor erroneously calculated the damages at hand. As verified by the testimony presented at trial (*see, e.g., TABLE 1,* page 102 *supra* ), the CL–2D subcontract agreement specified a base contract price of $975,000, not the figure of $980,374.64, as was utilized by the Debtor. (See TABLE 4, page 108 *supra* ).

In like manner, the Debtor erroneously calculated the contract costs incurred. As verified by the evidence presented at trial (*see, e.g., TABLE 2,* page 106 *supra* ), the payments made to the Defendant amounted to $842,535.00. At the same time, the amounts billed by the Defendant amounted to $852,535.00.

Finally, we are unable to accept the $307,-000 figure payable by the Debtor to Seaway to complete the job as the cost to complete the job as contracted. While we have been presented with no evidence that Seaway's charges were not reasonable for the work that Seaway performed at the time that it was performed, we agree with the Defendant that Seaway's charges were inflated beyond these properly chargeable to the Defendant due to the delay between the Defendant's performance of most of its work and Seaway's completion of the balance of the work, and the extra scrutiny which PTC and SEP-

TA imposed on Seaway's work as contrasting with that performed by the Defendant.

There is of course no precise means to adjust Seaway's $307,000 figure to the costs for completion of the contract and thus to assure complete accuracy in any such calculation. The means of measurement chosen by us to best approximate this figure arises from our finding that, although the Debtor claimed that only seventy (70%) percent of the contract work was performed by the Defendant (and the Defendant claimed that at least ninety-six (96%) percent was performed), we calculated the work completed as 86.41 percent, at pages 102–03 *supra.*

We accept $307,000 as the completion cost on the assumption that thirty (30%) percent of the contracted work remained uncompleted, and we find that in fact only approximately 13.6 percent of the contracted work remained uncompleted. In light of these conclusions, the $307,000 figure must be adjusted downward to $139,160 through application of the following formula:

$$\frac{13.6}{30} = \frac{x(\text{our figure})}{307}$$

Therefore, we conclude that "x," the cost of completion of the project attributed to the Defendant, is $139,160.

We of course eliminate any delay damages and back-charges, which we held were not proven at pages 107–11 *supra,* from our calculations. Revising the erroneous figures quoted by the Debtor, and inserting $139,160 as the cost of completion of the project, we conclude that the damages owed to the Debtor by the Defendant should be calculated as follows:

### AMOUNTS PAID ON CL–2D PROJECT

| | |
|---|---|
| Base Contract Price | $ 975,000.00 |
| Contract Costs | |
| (1) Payments made to the defendant ($ 842,535.00) | |
| (2) Deductible for general liability claim ($ 5,000) | − $ 847,535.00 |
| | |
| Amount Remaining to be Paid on Subcontract Agreement | $ 127,465.00 |

### COMPLETION COSTS PAID ON CL–2D PROJECT

| | |
|---|---|
| Amount Billed by the Defendant | $ 852,535.00 |
| Amount Paid to the Defendant | $ 842,000.00 |
| | |
| Outstanding Balance to be Paid | $ 10,535.00 |

### COMPUTATION FORMULA

| | |
|---|---|
| Costs of Completion of Project | $ 139,160.00 |
| Unpaid Part of the Contract Price | $ 127,465.00 |
| Outstanding Balance Owed to the Defendant | $ 10,535.00 |
| | |
| Damages Owed by the Defendant | $ 1,160.00 |

---

Thus, we determine that the damages payable to the Debtor from the Defendant are $1,160.00.

### D. *CONCLUSION*

An order which is consistent with the conclusions which we have reached in this Opinion and the Debtor's announced settlement with Seaway follows.

### *ORDER*

AND NOW, this 21st day of January, 1999, after a trial of the above-captioned proceeding on November 18, November 19, November 20, and November 30, 1998, and upon

114

careful consideration of the parties' respective submissions and the record, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff, CORNELL 7 COMPANY, INC. ("the Debtor") and against Defendant DELBERT L. SMITH COMPANY, INC. ("the Defendant") in part as follows:

 a. The proof of claim filed by the Defendant in this case is STRICKEN in its entirety.

 b. Judgment is entered in favor of the Debtor and against the Defendant on the Debtor's counterclaim to the proof of claim in the amount of $1,160.00.

2. Pursuant to the terms of the Debtor's settlement with Defendant SEAWAY PAINTING, INC. ("Seaway"), the Defendant shall pay the sum of $1,160.00 to Seaway.